**ASHLAND OIL, INC., Plaintiff,**

v.

**MILLER OIL PURCHASING CO., et al., Defendants,**

v.

**ROLLINS–PURLE, INC., Defendant-Third-Party Plaintiff-Appellant,**

v.

**Philip Alan FROUDE, et al., Defendants-Third-Party Defendants-Appellants,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, Defendant-Third-Party Defendant-Appellee.**

No. 81–3246.

United States Court of Appeals, Fifth Circuit.

June 24, 1982.

Faris, Ellis, Cutrone, Gilmore & Lautenschlaeger, H. S. H. Verlander, Jr., New Orleans, La., for plaintiff.

Schumacher, McGlinchey, Stafford, Mintz & Hoffman, Dermot S. McGlinchey, New Orleans, La., for Ins. Co. of North America.

Before GARZA, POLITZ and WILLIAMS, Circuit Judges.

PER CURIAM:

The judgment of the court below is AFFIRMED on the basis of the Findings of Fact and Conclusions of Law of the late Judge Jack M. Gordon entered June 5, 1979, as amended September 14, 1979, and attached below as appendices "A" and "B".

APPENDIX "A"

JACK M. GORDON, District Judge.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case arises out of a claim for damages by Ashland Oil, Inc., as a result of a fire at its refinery in Catlettsburg, Kentucky, and contamination of approximately 2,000,000 barrels of its crude oil stock. The damages are alleged to have been caused by a series of events and transactions which resulted in the injection of hazardous chemical waste products into Ashland's crude oil pipeline. Rollins-Purle, Inc., an industrial waste disposal company operating in Baton Rouge, Louisiana, purportedly sold certain chemical waste products to Larry Young. Thereafter, Young sold the material to Waco, Inc., a small family-owned oil reclaiming operation in the Natchez, Missis-

sippi, area. Waco sold the material to Miller Oil Purchasing Company which subsequently sold the material to Ashland Oil Purchasing, Inc., and injected it into a pipeline owned by Ashland Pipeline Company. The material found its way to Ashland's refinery in Catlettsburg and caused substantial damage to the refinery.

Trial of this case was confined to the several issues pertaining to liability, all issues as to quantum being reserved for trial at a later date, if appropriate. The status of the parties has been stipulated as follows:

*Plaintiff:*

Ashland Oil, Inc., a Kentucky corporation with its principal place of business in Ashland, Kentucky.

*Defendants:*

1. *Rollins Environmental Services, Inc.,* successor to Rollins-Purle, Inc., a Delaware corporation with its principal place of business in Wilmington, Delaware, a subsidiary wholly owned by Rollins International, Inc.

2. *Miller Oil Purchasing Company,* a Mississippi corporation with its principal place of business in Jackson, Mississippi, a subsidiary wholly owned by Ergon, Inc.

3. *Larry Young,* a resident of the Parish of Calcasieu, Louisiana.

4. *Alan Petroleum, Inc.,* a Louisiana corporation with its principal place of business in the Parish of Ascension.

5. *Glideville L. Creech,* doing business as *Truck Service and Rental,* a person of the full age of majority, domiciled in the Parish of East Baton Rouge, Louisiana.

6. *Mrs. E. A. Waldrop,* a resident of lawful age of majority of the City of Natchez, County of Adams, State of Mississippi (the said Mrs. E. A. Waldrop being substituted for the entity previously denominated as "Waco, Inc.")

7. *Insurance Company of North America,* a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

8. *Continental Casualty Company,* an Illinois corporation with its principal place of business in Chicago, Illinois.

*Third Party Defendants:*

1. *Ashland Oil Purchasing Company,* a corporation organized under the laws of the State of Kentucky, with its principal offices at Ashland, Kentucky, and which was and is qualified to do and doing business in the States of Louisiana and Mississippi.

2. *Ashland Oil Pipeline Company,* a corporation organized under the laws of the State of Kentucky, with its principal offices at Ashland, Kentucky, and which was and is qualified to do and is doing business in the States of Louisiana and Mississippi.

The Court enters the following findings of facts and conclusions of law.

### FINDING OF FACTS

1.

During 1970 and 1971, E. I. DuPont deNemours & Company, hereinafter referred to as "DuPont," manufactured chemical products at its Pontchartrain Works plant in the Parish of St. Charles, Louisiana. The process utilized by DuPont at its Pontchartrain Works plant produced a by-product of chemical substances identified as dichlorobutadiene, which contained heavy concentrations of organic chlorides. These virulent substances, identified by the symbols BR50 and BR68, are generally inimical to the environment: specifically, they are toxic and harmful to persons on touch or inhalation, corrosive to metals and other materials, noxiously malodorous, and pollutants of ground and surface water and plant and animal life. Prior to 1970, DuPont used a variety of methods to dispose of this industrial waste including deep-sea disposal, deep-well injection and on-site incineration.

## 2.

In November, 1971, Rollins-Purle, Inc., hereinafter referred to as "Rollins," was operating a waste disposal facility in Baton Rouge, Louisiana, for the purpose of disposing of numerous waste materials received from the several oil and chemical plants in the area. Rollins represents itself as an expert in the handling and disposal of chemical waste.[1] Rollins contacted and solicited a contract from DuPont to obtain and dispose of chemical waste products, including BR50 and BR68. Melvin L. Ruthrauff, the DuPont executive in charge of disposing of the waste, informed Rollins' personnel of the chemical components and propensities of the waste and supplied Rollins with a copy of the chemical breakdown of BR50 and BR68. Ruthrauff warned Rollins that these substances were corrosive and should be disposed of by incineration.[2]

## 3.

Between October, 1970 and April, 1971, Rollins received from DuPont 16,344.27 barrels of BR50 and BR68. The parties to this agreement intended the chemical waste to be disposed of by incineration;[3] however, Rollins encountered difficulty in this respect due to the corrosive effect of the BR50 and BR68 on its incinerator. In March of 1971, the corrosion rendered the incinerator inoperative. Peter Miller, a Rollins employee, testified that of all the waste it handled, the BR50 and BR68 were the "bear of the bunch." This colloquialism appears appropriate in light of the fact that the corrosive potential of BR50 and BR68 becomes more manifest through the application of heat to these substances. Heat accelerates the chemical breakdown of these substances and creates, among other things, hydrochloric acid.

## 4.

As a consequence of the operational failure of the Rollins incinerator, large quantities of various kinds of unburned industrial waste began to accumulate. To ameliorate this situation, Rollins purchased railroad tank cars within which to store the swelling amount of industrial waste upon its premises, including the large quantities of BR50 and BR68. This was but a stopgap measure for as Cliff Rogers testified, "The waste was coming out at Rollins' seams."[4]

## 5.

In order to maintain its lucrative business contact with DuPont, and to resolve this exigent situation, Rollins dispatched its Vice President, Harry A. Alsentzer, from its home office to its Baton Rouge facility. As Mr. Alsentzer admitted at trial, his stratagem was to "sell" Larry Young on the idea of relieving Rollins of the waste. He accomplished his objective for Larry Young agreed to take the BR50 and BR68.[5] Aware of the dangerous properties of the material that it was passing on to Larry

---

1. According to the Rollins *Press Kit*, Rollins advertises itself as "a complete pollution abatement service." See plaintiff's exhibit 47.

2. Ruthrauff, a graduate of chemical engineering from Kansas State University, was in charge of environmental engineering at the DuPont plant from 1963 to 1971. He is presently employed by Babcock & Wilcox as safety and health manager. At trial he testified concerning the nature of BR50 and BR68 and gave his unequivocal opinion that these substances are dangerous and ultrahazardous. This opinion was concurred in by Duane Chapman, a chemist employed as manager of research and development for Ashland Oil, Inc.

3. The "DuPont Standard Terms and Conditions for Waste Disposal," which formed a part of the waste removal contract between DuPont and Rollins, required Rollins to: "perform [its] services in a careful and workmanlike manner ... to take all necessary precautions in the handling, transportation and disposal of materials in order to avoid injuries to persons and damage to property ... to comply with all present and future laws, ordinances, rules and regulations of federal, state, municipal and other governmental authorities applicable to the services to be performed." See joint exhibits Nos. 9, 10 and 14.

4. Mr. Cliff Rogers was the transportation manager at the Rollins plant in Baton Rouge, Louisiana.

5. Although Larry Young was ostensibly to purchase the waste for 35¢ per barrel, the evidence indicates that he only paid for a portion of the total volume of BR50 and BR68 obtained from Rollins. Rollins made no effort to collect the balance.

Young and that it was breaching its obligation to DuPont, Rollins required Young to assure it in writing that the material sold would "not be traced back to its original origin." [6]

Rollins took additional precautions to assure that this material, if discovered, would not be traced to its Baton Rouge facility. It deviated from routine business procedures in that invoices were not prepared; it did not object to Young's not paying for the bulk of the material; of the few payments it did receive, Rollins allocated the money to petty cash; and none of the Young transactions were recorded in its financial books or records. Rollins did not conduct an investigation or background check of Young to ascertain whether he had the necessary expertise to handle the disposal of these chemical waste products.

Although Young characterized himself in his deposition testimony as one having been involved from his youth in the fringe areas of the petrochemical industry, the salient fact deduced from this testimony is that he was not qualified, by education or experience, to responsibly handle the disposal of the BR50 and BR68. Mr. Alsentzer testified that it was "immoral" and "wrong" for him to sell the dangerous material to Young and that he was "negligent" in so doing. It is neither the duty nor function of the Court to render an opinion as to the morality of the conduct in question. Nor does the Court attribute probative value to the legal parlance with which the witness chose to assess his conduct. However, the Court notes that Mr. Alsentzer's description of his conduct as "negligent" was inaccurate,[7] for documents drafted contemporaneously with the Young-Rollins transaction indicate that Rollins *intended* the consequences of its action. An interoffice memorandum prepared by Alsentzer the day the agreement with Young was consummated, and issued to Cliff Rogers, transportation manager, Peter Miller, local sales manager, and H. L. Scott, with carbon copies sent to R. C. Gregory and G. E. Brooking, Jr., the president of Rollins, provided:

1. This is for intercompany use only.

2. Beginning today, at least one truck per day will be removed from the plant by Alan Petroleum Company,[8] Gonzales, La.—Larry Young (contract). *Material to be mixed with crude stock for discharge into pipeline* . . . .

3. Project to be directed and handled by C. Rogers under control set by the plant manager.

4. . . .

5. It must be emphasized that this arrangement requires careful attention. P. Miller must be informed of any changes that are required of DuPont in order to accommodate these pick-ups.

6. *Under no conditions is DuPont or anyone else to be advised of what we are doing with this material without prior approval from G. E. Brooking, Jr.*[9] (Emphasis added)

At trial Mr. Alsentzer testified that he was speaking metaphorically when he wrote "for discharge into pipeline"; however, no figurative meaning was offered for the beginning of the sentence, "material to be mixed with crude stock." Considering the limited number of personnel to whom this interoffice memorandum was issued, that it was prepared contemporaneously with the Young agreement, and that those privy to this arrangement were admonished to be silent regarding it, the Court is persuaded that the language of the memorandum is to be given its common sense meaning and not the subliminal meaning assigned to it by Mr. Alsentzer after suit had been filed.

---

6. This secrecy pact was addressed to Rollins, attention Harry Alsentzer. It was executed by Larry Young the day after his verbal agreement with Rollins.

7. As will be noted in the Court's conclusion of law, this characterization of Mr. Alsentzer was self-serving and not deprecatory as may appear on first impression.

8. Alan Petroleum Company was the company through which Young conducted his business.

9. See joint exhibit No. 13, also marked for identification as Miller exhibit No. 2.

The statement of Mr. J. R. Hamm [10] dispels any doubt concerning the awareness of Rollins as to the ultimate destination of the BR50 and BR68. He states:

> ... Both products [BR50 and BR68] were successfully incinerated up until March 1, 1971 when the incinerator was shut down for repairs. It was during this period of downtime that the plant management started to consider alternative methods of disposal for the DuPont products.
>
> I was advised by *plant management* that the above products were *to be hauled from the plant by truck load to a site in Mississippi and disposed of in some manner unknown to me. I did know that it would eventually wind up in a pipeline of crude oil and cautioned the plant salesman Peter Miller and Transportation Supervisor Cliff Rogers about potential corrosive damage to the pipeline and the refinery. I also cautioned them about the potential chemical burns which could occur to drivers and others who handled the products* .... On or about March 28, 1971, the loads began to leave the plant for Mississippi and eventually a crude oil pipeline ... (emphasis added)

The credibility of this statement is enhanced by the fact that it was taken by two Rollins officials, one a former FBI agent, at a time when a lawsuit had not been filed, and it was unclear whether Rollins had contributed to the damage sustained by Ashland Oil, Inc., hereinafter referred to as "Ashland."

At the time of the Rollins-Young arrangement, Rollins realized that the waste was destined to be discharged into a crude oil pipeline. It had hoped that upon being integrated with a flow of crude oil, the chemical waste would become incapable of being traced to its original source. By involving Young in its expedient solution, Rollins believed that it had obfuscated its participation in the subsequent series of events.

6.

Although subpoenaed, Young did not deign to appear at trial. Nevertheless, it is clear from the facts before the Court that he either knew or should have known the true nature of the industrial waste he agreed to dispose.

Young neither owned nor had access to vehicles necessary to transport the waste from Rollins' premises. Therefore, Cliff Rogers contacted Mr. Glideville L. Creech, doing business as Truck Service & Rentals, who had previously performed hauling services for Rollins, and inquired if he would be interested in hauling waste oil or waste material. Upon responding affirmatively, Rogers put him in touch with Young. Thereafter, Young contracted with Creech to transport the material from Rollins' Baton Rouge plant to a location outside Ferriday, Louisiana.[11] Creech's trucks delivered seventeen shipments during a period of a month for $90.00 per load. During this time Creech was neither apprised nor did he learn the true nature of the material being transported. When several of the Creech drivers complained to Rollins personnel about the foul odor of the waste, Rollins provided creosote as an additive in an effort to disguise the odor.

7.

Approximately 2,016 barrels of the waste hauled from the Rollins plant by Creech were pumped into the two storage tanks owned by Waco, Inc., hereinafter referred to as "Waco," a small oil reclaiming operator in the Natchez, Mississippi, area.[12] Young, through his company, Alan Petroleum, Inc., entered into a written agreement with Mr. and Mrs. E. A. Waldrop, who owned and operated Waco, whereby the latter would purchase "petroleum products"

---

**10.** Mr. Hamm is a chemist employed as technical manager at Rollins' Baton Rouge facility.

**11.** The material was ultimately transported to an area outside of Natchez, Mississippi. Creech testified that he was not aware of a change from the terms of his agreement with Young. This is entirely plausible for Natchez is approximately 20 miles from Ferriday, Louisiana.

**12.** Mrs. E. A. Waldrop has been substituted for the entity previously denominated as "Waco, Inc."

supplied by Young for a price of $2.60 per barrel.

The Waldrops did not have blending or physical facilities with which to provide treatment to the BR50 and BR68 so as to render them usable crude oil. Rollins personnel, Peter Miller and Cliff Rogers, viewed the Waco site and knew the facilities there were not capable of converting the waste to crude oil. They neither inquired as to who owned the tanks nor ascertained the type of blending or reclaiming operations allegedly conducted by the Waldrops. Rollins did not take any precautions to insure that the BR50 and BR68 would be handled and disposed of by Young in a safe and lawful manner.

### 8.

Waco sold some of the waste material either in its original state or in a partly diluted state to Miller Oil Purchasing Company, hereinafter referred to as "Miller," for the price of $3.165 per barrel. For many years prior to 1971, Waco had sold crude oil to Miller, which operated as a crude oil purchaser, transporter and seller, buying crude oil from producers and transporting the same to the receiving facilities of the entities to whom the crude oil was sold. Miller contracted to sell and sold to Ashland Oil Purchasing Company hereinafter referred to as "Ashland Purchasing," a wholly-owned subsidiary of Ashland crude oil acquired by Miller at its Natchez, Mississippi, terminal. Under the terms and conditions of this sales contract, Miller was obligated to:

(a) sell Ashland Purchasing only merchantable crude oil suitable for resale or processing;

(b) sell oil with B.S.&W. (basic sediment and water) content not in excess of that provided for in the pipeline tariff under which the oil was to be transported, at that time ½ of one percent (½ of 1%);

(c) maintain accurate records and accounts of the quantity and quality of the oil purchased by it and sold to Ashland Purchasing;

(d) deliver the crude oil sold to the metering station of Ashland Pipeline Co., hereinafter referred to as "Ashland Pipeline," a wholly owned subsidiary of Ashland, which owned and operated a crude oil gathering system in Natchez, Mississippi, area.

The substance Miller purchased from Waco was tested by Miller to determine if the substance was oil and if so, to ascertain the quality thereof. In March, 1971, Benny J. Arnold, a Miller gauger of approximately 12 years, attempted to take a gravity reading at the Waco tanks but was unsuccessful because the hydrometer failed to record any gravity whatsoever. In the process of making his futile attempt, Arnold's leg was burned by slight contact with the substance. Arnold also had a distinct recollection of an unusual odor emanating from the Waco tanks. During Arnold's attempt to gauge the waste material, Dicky Waldrop, son of E. A. Waldrop, the owner of the premises and Waco, was present. Arnold told him that he would have no further contact with the material in Waco's tanks. A few days later, Arnold returned to the Waco tanks and discovered that since his previous visit the second Waco tank had been filled with the same foul substance. He refused to gauge either tank. Following both occasions, Arnold contacted the assistant terminal manager for Miller, Jimmy W. Priest, and related this information to him. Priest advised Cotton Williams, Miller's terminal manager, of the information furnished him by Arnold. No action was taken by Williams.

After Arnold's hydrometer was rejected by the waste material, C. B. Todd was dispatched to gauge the substance and complete the gauge tickets. Todd encountered difficulties similar to Arnold's experience in that he found the substance malodorous, he sustained burns as a result of contact with the waste, and he was unable to record the gravity of the substance with a hydrometer. Consequently, when he filled out the gauge tickets he did not attempt another hydrometer reading. At trial, Todd candidly admitted that the gauge tickets were purposefully falsified. Todd was instructed to "put

down a figure in the middle" by his nephew and boss, Cotton Williams. Pursuant to this directive, the Waco gravity readings were falsified.

Although several witnesses testified that Cotton Williams and Waldrop were good friends, the Miller gaugers' practice of falsifying gauge tickets was not a gratuity. Miller gaugers had an "arrangement" according to Todd, whereby they would pick up four bottles of whiskey from the Waco office before departing from the Waco site.

On a number of occasions prior to the Ashland shutdown, Williams and Priest discussed Miller's business with Waco. Williams testified that he knew about the gaugers' complaints concerning the odor of the material in the Waco tanks. Furthermore, Williams admitted that he had instructed gaugers to use an average gravity reading and that he was aware of the whiskey custom. However, he denied having knowledge, prior to the Ashland shutdown, of the absence of a gravity reading, the burns sustained by Miller employees, or that Arnold refused to gauge the Waco tanks. Having considered all the evidence and having observed the demeanor of each witness, the Court finds the veracity of Cotton Williams' denials to have been seriously impugned.

Arnold, Todd, Priest and Williams had knowledge that the waste material in the Waco tanks was not merchantable crude oil suitable for resale or processing. Nevertheless, Miller purchased the substance and sold it to Ashland Purchasing and injected it into Ashland Pipeline's network. Miller was aware that any substance introduced into the Ashland pipeline system at the Cranfield junction would become a part of the continuous flow of crude oil destined for ultimate delivery to Ashland's refinery at Catlettsburg, Kentucky.

9.

Approximately 1,941 barrels of BR50 and BR68 purchased from Waldrop by Miller were pumped into the crude oil gathering lines of Ashland Pipeline. Miller paid Waldrop for the substance which it obtained from Waldrop in March of 1971. The Miller bill to Ashland for crude oil sold and delivered in March of 1971 included 984.06 barrels of the substance. The letter which transmitted the contracts between Miller and Ashland is a letter by Ashland Oil Refinery, which was the predecessor to Ashland. Miller actually billed Ashland for the crude oil sold and delivered under the contract. Ashland did not have knowledge that the Miller March bill included charges for the substance and the bill was paid. When Miller became apprised that it had injected the substance into the Ashland pipeline, it adjusted its crude oil bill to Ashland for April to exclude the quantity of the substance which Miller received from Waldrop and injected into the Ashland pipeline in April. There existed no formal sales agreement between Ashland Purchasing and Ashland; Ashland Purchasing realized no profit on the purchase of crude oil from Miller and the transfer of the same to Ashland; and all funds Ashland Purchasing was required to pay Miller were made available by Ashland. This latter transaction was accomplished by intercompany bookkeeping entries.

Ashland Pipeline is a common carrier. In the Mississippi area it operated a crude oil gathering line which received oil from producers and other sellers and through which the crude oil so received was transported to the Capline at Liberty, Mississippi. The Capline is a large crude oil pipeline which transports crude oil from the producing areas of Southern Louisiana and Mississippi to Patoka, Illinois, for the account of certain of its owners, including Ashland. The DuPont waste material identified as BR50 and BR68 obtained by Miller from the Waldrop tanks and injected into the Ashland pipeline system at the Cranfield metering station travelled as follows:

(a) From the Cranfield metering station to the Cranfield junction at Cranfield, Mississippi, in Ashland's pipeline system;

(b) From the Cranfield junction to Liberty, Mississippi, to the Capline junction there in Ashland's pipeline system;

(c) At Liberty, Mississippi, it was batched with Ashland's other crude oil supply and shipped via the Capline pipeline system to Patoka, Illinois;

(d) At Patoka, Illinois, the batches of Ashland's crude oil supply containing BR50 and BR68 entered Ashland's tank storage system;

(e) The crude oil supply containing the substances BR50 and BR68 was piped via Ashland's system from Patoka, Illinois, to Owensboro, Kentucky, where it entered Ashland's tanks;

(f) The crude oil supply containing the substances BR50 and BR68 was loaded into the barges and towed to Ashland's tanks at Kenova, Kentucky, where it was unloaded;

(g) The crude oil supply containing the substances BR50 and BR68 was then piped from Kenova, Kentucky, via Ashland's system to the Catlettsburg refinery tanks for induction into the refining process.

On April 18, 1971, Ashland's crude oil supply containing BR50 and BR68 entered the Catlettsburg refinery tanks at Catlettsburg, Kentucky, as a part of the continuous flow of crude oil supply to and through the refinery. On April 19, 1971, a portion of the DuPont waste material, BR50 and BR68, mixed with crude oil, entered the refinery stream at the Catlettsburg refinery, causing a fire and explosion which damaged the refinery. The substances BR50 and BR68 which were injected into the Ashland crude oil supply and transportation facilities utilized by Ashland caused approximately 2,000,000 barrels of oil to be contaminated.

## CONCLUSIONS OF LAW

### I. JURISDICTION

Jurisdiction of this case is conferred upon this Court by 28 U.S.C. § 1332.

### II. CHOICE OF LAWS

■ Several legal theories have been suggested to the Court upon which the liability of the various parties may be predicated. However, before the Court considers the merits of these issues, it must first decide the issue of legislative jurisdiction; that is, the choice of state law to be applied to the controversy. *Erie R. R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In so doing, the Court is bound to apply the conflict of laws rules of Louisiana, the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

### A. THE *JAGERS* APPROACH

Louisiana no longer adheres to the traditional lex loci delicti rule, or "vested rights" doctrine. *Jagers v. Royal Indemnity Co.*, 276 So.2d 309 (1973). In *Jagers* the Louisiana Supreme Court referred to Restatement, Second, Conflicts of Laws, § 6 (1969), the interest analysis rule; however, it did not specifically endorse this authority as Louisiana law on resolution of conflicts. The first court to broach the void, newly created by *Jagers*, was the Court of Appeals for the Fifth Circuit in *Brinkley & West, Inc. v. Foremost Ins. Co.*, 499 F.2d 928 (5th Cir. 1974). Performing its *Klaxon* duties the Court held that Louisiana would opt for the approach of the Second Restatement, stating:

> [F]or our Erie purposes we agree that the Court's note 3 adopts the analysis of the Second Restatement. Therefore, since Jagers is the only weather vane available, the interest analysis principles embodied in the Second Restatement are the applicable conflicts law of Louisiana and our vehicle for deciding this case. (449 F.2d at 932)

This decision was most recently reaffirmed in *Cooper v. American Express Co.*, 593 F.2d 612 (5th Cir. 1979).

The general principles of the interest analysis method of resolving conflicts of the nature involved in this matter are stated in §§ 6 and 145 of the Restatement, Second, which provide:

> § 6. Choice-of-Law Principles
>
> (1) A court, subject to constitutional restrictions, will follow a statutory di-

rective of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

 (a) the needs of the interstate and international systems,

 (b) the relevant policies of the forum,

 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

 (d) the protection of justified expectations,

 (e) the basic policies underlying the particular field of law,

 (f) certainty, predictability and uniformity of result, and

 (g) ease in the determination and application of the law to be applied.

§ 145. The General Principle

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

 (a) the place where the injury occurred,

 (b) the place where the conduct causing the injury occurred,

 (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

 (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

If the application of the law of one interested state would produce a different resolution of a particular issue than would the application of the law of another interested state, then this Court is bound to separately analyze that issue in order to ascertain which state has greatest concern in the determination of that issue.[13] Because this case presents a complicated concatenation of tortious conduct and breached warranties in Louisiana and Mississippi with resulting damages being sustained by Ashland in Mississippi and Kentucky, the Court will separately consider each party as it, or he, relates to a particular issue.

### B. INTEREST ANALYSIS APPLIED

#### 1. Rollins

##### (a) *Liability*

Under the general principles set out in § 145 of the Restatement, supra, the issue of the liability of Rollins will be resolved by the local law of Louisiana for it has the most significant relationship to the occurrence and the parties. Rollins' actions are centered in Louisiana, with the exception of one excursion into Mississippi by certain of its employees to determine where Young had deposited the BR50 and BR68. Upon observing the Waco tanks into which Young had delivered the substance, the Rollins employees promptly returned to Baton Rouge without further inquiry. Rollins' dealings with DuPont, Young, and Creech all took place in Louisiana, and the insurance policies written by I.N.A. covered the plant located in Louisiana. The entirety of Rollins' wrongdoing occurred in Louisiana, and it was in Louisiana that Rollins peddled the dangerous substance to Young who launched it into the stream of interstate commerce.

##### (b) *Damages*

The local law of Louisiana also controls the determination of the issue of punitive damages in regard to Rollins. Section 171

---

**13.** *Ardoyno v. Kyzar,* 426 F.Supp. 78 (E.D.La. 1976) and *Restatement,* Second, *Conflicts of*

*Laws* (1971) § 145, Comment D.

of the Second Restatement, supra, and comment d thereto provide:

§ 171 Damages

The law selected by application of the rule of § 145 determines the measure of damages.

Comment:

d. *Exemplary damages.* The law selected by application of the rule of § 145 determines the right to exemplary damages.

The Reporter's Note on Comment d cites the case of *James v. Powell,* 19 N.Y.2d 249, 279 N.Y.S.2d 10, 225 N.E.2d 741 (1967). In that case the plaintiff sued Adam Clayton Powell for fraudulently conveying real estate in Puerto Rico to avoid execution on a New York judgment held by the plaintiff. The New York Court of Appeals remanded the case to determine whether the conveyance was valid under Puerto Rican law, but held that New York law would determine whether punitive damages could be recovered. The application of the local law of one state to the issue of compensatory damage and the application of the local law of another state to the issue of punitive damages was premised upon the distinction between the two types of damages. The Court observed:

An award of compensatory damages depends upon the existence of wrongdoing... An award of punitive damages, on the other hand, depends upon the *object or purpose* of the wrongdoing.... (Court's emphasis) 279 N.Y.S.2d at 17–18, 225 N.E.2d at 746–47.

The *Powell* court held that the purpose of the conveyance was to frustrate a New York judgment; therefore, New York had the strongest interest in the determination of the issue of whether punitive damages were recoverable.

The result obtained in *Powell* cannot be analogized to the facts in the instant case because the object or purpose of Rollins' conduct was not to do damage to Ashland in Mississippi, but simply to rid itself of a business burden as expediently as possible. The evidence does not indicate that Rollins chose the State of Mississippi as the situs of the "dump" by preconcertment.

This conclusion is reinforced by the Restatement's comment on § 145(2):

c. *Important contacts in determining state of most significant relationship* :

When the injury occurred in two or more states, or when the place of injury cannot be ascertained or is fortuitous and, with respect to the particular issue, bears little relation to the occurrence and the parties, the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law. Likewise, *when the primary purpose of the tort rule involved is to deter or punish misconduct, the place where the conduct occurred has peculiar significance.* (emphasis added)

The purpose of exemplary damages is defined in 22 Am.Jur.2d 237 at p. 323 as:

Allowed and awarded as a punishment to the defendant and as a warning and example to deter him and others from committing like offenses in the future.

Excepting one brief excursion into Mississippi by two Rollins employees, all of the egregious misconduct of this company, that holds itself out as a complete pollution abatement service, occurred in Louisiana. Accordingly, this Court concludes that the local law of Louisiana shall control the issue of whether punitive damages shall be assessed against Rollins.

(c) *Insurance Coverage*

■ In interpreting the insurance policy covering Rollins, the law of Louisiana applies since the risk insured, the Rollins plant in East Baton Rouge Parish, is located in Louisiana. The pertinent conflict of laws rule on this point is found in § 193 of the Restatement of the Law, Conflict of Laws, Second, wherein it is provided:

The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of

the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

### 2. *Young*

■ Larry Young is domiciled in Louisiana. His misconduct in conjunction with Rollins was centered in Louisiana. The purpose of this association was the disposal of the quantities of BR50 and BR68. Young, who knew or should have known the dangerous propensities of the industrial waste he was handling, accomplished this purpose by selling it to a small family-owned reclaimed-oil outfit that owned only two storage tanks in a wooded area near Natchez, Mississippi. Young knew that Waco was not equipped to provide the necessary treatment so as to render the BR50 and BR68 usable crude oil. The evidence clearly indicates that Young intended, *ab initio*, to have the corrupt substance introduced into a crude oil pipeline wherein it would be diluted and dispersed.

Young's delictual activity was manifested in both Louisiana and Mississippi. There would be no difficulty in marshaling sufficient contacts to satisfy due process in the application of the local law of either Louisiana or Mississippi to the issues of Young's liability and damages. However, Louisiana has the strongest interest in the resolution of the issue of Young's liability and Mississippi has the strongest interest in the resolution of the issue of Young's damages. Although the preponderance of Young's misconduct occurred in Louisiana, he knowingly transported the substances into Mississippi disguised as a benign oil product, fully cognizant that it would enter a pipeline. The integrity of the business commu-

nity within Mississippi's jurisdiction was violated by Young's wanton enterprise. The purpose of Mississippi's exemplary damages rule would be accomplished by applying the rule to Young.

### 3. *Creech*

■ Creech is a Louisiana domiciliary. The agreement to deliver the BR50 and BR68 to Waco was a Louisiana contract, and Creech was paid by Young in Louisiana. Although his trucks did travel into Mississippi, upon completion of the deliveries, they immediately returned to Louisiana. Creech's contacts were centered in Louisiana. Consequently all issues pertaining to him are controlled by the local law of Louisiana.

### 4. *Waco*

Waco is a Mississippi concern that acted only in Mississippi; therefore, the issues of its liability and damages are controlled by the local law of Mississippi.

### 5. *Miller*

Miller is domiciled in Mississippi and the totality of its contacts are centered in Mississippi. Therefore, all issues concerning Miller are governed by Mississippi law.

### 6. *Ashland*

■ Although Ashland is domiciled in Kentucky and sustained damages in Kentucky, the greatest portion of its damages occurred in Mississippi where its oil supply was initially contaminated. Furthermore, its contract with Miller was a Mississippi contract and title to the substances passed from Miller to it in Mississippi. On this basis, the local law of Mississippi applies to all issues between the parties to the sale.[14]

The only material difference between the laws of Louisiana, Mississippi and Kentucky is that Louisiana does not allow punitive damages.

---

**14.** It should be noted that there is no genuine difference between the laws of Mississippi and Kentucky. Comment i to § 145 of the Restatement, supra, provides:

When certain contacts involving a tort are located in two or more states with identical

local rules on the issue in question, the case will be treated for choice-of-law purposes as if these contacts were grouped in a single state.

## III. MERITS OF THE CASE

Having determined which state's local law is applicable to the resolution of the various issues as they relate to each party, the Court will now consider the merits of the case.

It is the position of Ashland that each defendant is liable under a theory of strict liability predicated upon its involvement in an abnormally dangerous activity or its role as a seller of a defective product. Alternatively, plaintiff maintains that each defendant is liable under a negligence cause of action and asserts that Waco and Miller are liable for breach of an express and/or implied warranty. Rollins, Creech, Waco, and Miller deny liability. Young failed to respond.

### A. STRICT LIABILITY: Ultrahazardous or Abnormally Dangerous Activity

#### 1. *Rollins and Young*

Rollins properly represents itself as an expert in the field of chemical waste disposal. Prior to the consummation of its agreement with DuPont, Rollins was supplied with a comprehensive chemical analysis of BR50 and BR68, and was fully advised of its dangerous propensities. According to the admissions of key Rollins personnel, Rollins was cognizant of the fact that the waste was an ultrahazardous product. Notwithstanding its appreciation of the hazardous character of these substances, when its incinerator was rendered inoperative by the industrial waste, a select group of Rollins' personnel directed by Mr. Alsentzer devised a plan to introduce the BR50 and BR68 into a crude oil pipeline.[15] Mr. Young acquiesced to Rollins' request that he not disclose the source of the waste. The evidence indicates that he was aware of the nature of these substances.

A case involving a similar activity is *Langlois v. Allied Chemical Corp.*, 249 So.2d 133 (La.1971). In *Langlois* the plaintiff, a fireman employed by the Baton Rouge Fire Department, filed suit for personal injuries he sustained from inhalation of a gas that escaped from the Allied Chemical Corporation. The Louisiana Supreme Court concluded:

> The storage of the dangerous, highly poisonous gas by Allied was an activity which, even when conducted with the greatest of care and prudence, could cause damage to others in the neighborhood. It was an ultrahazardous activity, and the possible consequences of the gas escaping and causing harm were known or should have been known. (249 So.2d 139)

In a footnote the Court noted that in ultrahazardous activities such as this, common law jurisdictions impose liability in the absence of negligence. The Court cited, among other authorities, Restatement, Torts § 519 (1938) and Restatement, Torts, Second, (Tent. Draft No. 10 1964), § 519–520. Section 519 provides:

General Principle

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

In determining whether an activity is one for which liability attaches, without negligence, the Louisiana Supreme Court held that the following factors are to be considered:

> The law and customs, a balancing of claims and interests, a weighing of the risk and the gravity of harm, and a consideration of individual and societal rights and obligations.[16]

Although reference was not made to Restatement, Torts, Second, § 520, in *Langlois*, supra, the factors enumerated therein

---

**15.** This action was taken despite the admonitions of Rollins' chemist, J. R. Hamm.

**16.** 249 So.2d at 140.

are strikingly similar. Section 520 provides:

### Abnormally Dangerous Activities

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

▪ Applying the factors articulated by the Louisiana Supreme Court in *Langlois* and in § 520 of the Restatement, Second, to the conduct of Rollins and Young, the Court is constrained to hold that the disposal of the BR50 and BR68 by these defendants was an abnormally dangerous and ultrahazardous activity.

▪ The issue of whether contributory negligence is a defense to strict liability for ultrahazardous activity was resolved in *Langlois*, supra, wherein the Court held:

This case is not a case where negligence is an ingredient of fault, and contributory negligence is not a defense. Usually the assumption of risk doctrine will apply where the nature of the relationship of the parties appears to exact consent from the one injured to be exposed to possible harm. In such situations the plaintiff understands the risk involved and accepts the risk as well as the inherent possibility of damage because of the risk.[17] (249 So.2d 140)

Rollins' defense to this suit is that its misconduct was not the proximate cause of

the damages sustained by Ashland. Rollins has framed the issue in the following terms: "Could Rollins-Purle reasonably foresee that Miller Oil Purchasing Company would knowingly purchase this waste material from Waco as 'crude oil' and then sell this material, in breach of its contract with Ashland, to Ashland as crude oil?" By answering this question in the negative Rollins contends that its misconduct was too remote to be a proximate cause of Ashland's damage.

▪ The Court rejects this position. This rationale is contrary to the reason for imposing strict liability upon those who carry on abnormally dangerous activities. The principle underlying this cause of action is that those engaged in such activity have, for the furtherance of their own purposes, created an inordinate risk. Should this risk be realized and a real injury sustained, it would be immaterial that the harm occurred through the unexpected action of another party. This rule is succinctly stated in § 522 of the Restatement of Torts, Second:

One carrying on an abnormally dangerous activity is subject to strict liability for the resulting harm although it is caused by the unexpectable

(a) innocent, negligent or reckless conduct of a third person,

(b) action of an animal, or

(c) operation of a force of nature.

Furthermore, a reasonably probable consequence of disposing of industrial waste by introducing it into interstate commerce disguised as a benign oil product is that it will contaminate crude oil stock and damage a refinery.

Accordingly, the Court holds that Rollins' proximate cause defense is truncated not only by the rationale upon which this form of strict liability is premised but also by the facts.

*Wunstell v. Crochet*, 325 So.2d 727 (La.App. 4th Cir. 1976).

---

**17.** Reference was made to the Restatement, Torts, Second, § 496 (1965) in its discussion of defenses to this cause of action. See also,

## B. INTENTIONAL TORT

### 1. *Rollins*

Although Ashland omitted this cause of action from its theory of the case, the Court concludes that Rollins intended the consequences of its conduct. The evidence is clear that Rollins intended to inject the BR50 and BR68 into a crude oil pipeline and that Rollins' President, Vice President and several of its personnel at its Baton Rouge facility were privy to this plan. Rollins, being fully aware of the chemical analysis of this industrial waste, knew that its selected method of disposal posed an imminent threat to crude oil stock, the oil refinery process, and those who handled it; nevertheless, it elected to pursue this expedient alternative. In that Rollins knew that this danger was substantially certain to result from the execution of its plan, Rollins is held to have intended the consequence.

It is not necessary for the Court to find that Rollins harbored a hostile intent, or desired to do any harm in order to hold that Rollins committed an intentional tort. Commenting upon the meaning of intent with which tort liability is concerned, William L. Prosser states:

> ... it is an intent to bring about a result which will invade the interests of another in a way that the law will not sanction. (*Law of Torts* (4th) § 8, p. 31)

The result which Rollins intended was the disposal of the BR50 and BR68 by putting it into a pipeline. The contamination to Ashland's crude oil stock and explosion at its refinery was an invasion of Ashland's interest that was substantially certain to occur as a consequence of Rollins' course of action. Although the foreseeability limitation raised by Rollins is often cast aside in the area of intentional torts, the Court nevertheless concludes that the events subsequent to Rollins' moving the substance into interstate commerce were reasonably foreseeable. It is untenable that Rollins intended to inject these materials into a crude oil pipeline but could not foresee contamination to crude oil stock or damage to the refinery process. Upon this basis the Court concludes that Rollins is responsible for the damage occasioned by its intentional conduct.

## C. STRICT LIABILITY: Sellers of Defective Product

### 1. *Miller and Waco*

Ashland contends that Miller and Waco are liable under the theory of strict liability as a seller of a defective product. As noted above, Mississippi law governs the issues of Miller's and Waco's liability and damages.

In *State Stove Manufacturing Co. v. Hodges*, 189 So.2d 113 (Miss.S.Ct.1966), homeowners filed suit against the contractors who constructed their home and installed an electric hot water heater which exploded and destroyed their home eight months after they had moved into the house. The hot water heater was manufactured by State Stove Manufacturing Co. of Ashland City, Tennessee, which sold the heater to Orgill Brothers, a Memphis wholesaler. Orgill Brothers in turn sold the appliance to Yates and Gary, the contractors who built the plaintiffs' home. State Stove enclosed with the heater a set of instructions directing installation of a combination temperature and pressure relief valve accompanied by detailed diagrams of the proper method to install the prescribed combination valve. Pittman, the plumber hired by Yates and Gary to perform the actual installation, did not install a temperature valve on the hot water heater, although he knew the instructions directed this was to be done. The court found that had Yates and Gary followed the instructions of State Stove, the explosion would have been prevented.

The first issue dispensed with by the Mississippi Supreme Court was whether liability could attach without privity of contract between the seller and ultimate purchaser. Specifically overruling prior jurisprudence the court held that privity of contract is not necessary. The court stated:

> Privity of contract between a consumer of a product and its manufacturer has not only been abandoned by every state in

the Union, except Mississippi, but it has no rational basis for continuance in such an action in this jurisdiction. The manufacturer, by placing a chattel or product upon the market, assumes a responsibility to the consumer, resting not upon the contract but upon the relation arising from his purchase, together with the foreseeability of harm if proper care is not used. (189 So.2d 116)

In this case the Mississippi Supreme Court adopted § 402 A of the Restatement of Torts (Second) as the appropriate standard for determining liability of one who sells a defective product. It states:

Special liability of seller of product for physical harm to user or consumer—

(1) *One who sells* any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) *the seller* is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in subsection (i) applies although

(a) *the seller* has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller. (emphasis added)

The court held the contractors strictly liable and further stated:

If the article left the defendant's control in a dangerously unsafe condition, or was not reasonably safe, or was unsafe for its intended use, the defendant is liable whether or not he was at fault in creating that condition, or in failing to discover and eliminate it.... The issue is whether the product is "unreasonably dangerous" or not reasonably safe....

18. See Comment 1. *User or Consumer* of

In other words, the Restatement rule of Section 402 A "applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him," or not reasonably safe. Restatement (Second) Torts, Section 402 A, comment 8.

The manufacturer is liable strictly in tort only if (a) he puts on the market a product which is not reasonably safe, and (b) the plaintiff is injured as a result of a contemplated use of it. The action is different from negligence mainly in the element of *scienter*: Plaintiff will not need to prove either that defendant negligently created the unsafe condition of the product or that he was aware of it. (189 So.2d 120–121)

 Both Waco and Miller are in the business of selling crude oil or tank bottoms. The ultimate consumers of these products are those in the business of refining crude oil into commercially usable oil products.[18] Miller knew that the industrial waste it put into Ashland's pipeline at Cranfield Station would ultimately reach Ashland's refinery. Waco was fully apprised of the fact that Miller sold exclusively to Ashland. Therefore, Ashland's damages resulted from a use of the BR50 and BR68 contemplated by both Miller and Waco as sellers and Ashland as the ultimate consumer. The industrial waste sold by Waco to Miller and subsequently sold by Miller to Ashland as crude oil was, beyond cavil, unreasonably dangerous to crude oil stock and the refinery process. Thus, having concluded that the BR50 and BR68 were defective, it is irrelevant whether Waco or Miller knew or should have known the dangerous properties of the material, for they are presumed to know the defects in the products they sell. The importance of this presumption is not fully appreciated in this instance because the Court has found that Miller knew the BR50 and BR68 were not crude oil and that Waco either knew or should have known the same. It is immaterial that Waco did not deal directly with

§ 402 A, Restatement, Second, Torts.

Ashland for as is provided in § 402 A(2)(b), it is not necessary that the ultimate user or consumer have acquired the product directly from the seller.

The actions of Waco and Miller in falsifying quality reports[19] and then selling the waste as crude oil was a direct cause of the damage suffered by Ashland.

Liability under § 402 A is the same as that imposed upon those who engage in abnormally dangerous activity inasmuch as it is not based upon negligence. Thus, Ashland's failure to discover the defect or to adequately guard against the possibility of its existence will not bar its cause of action for contributory negligence is not a defense. Although assumption of risk is a defense, the Court finds that Ashland neither voluntarily nor unreasonably proceeded to encounter a known danger.

Upon this authority the Court concludes that Waco and Miller are liable to Ashland for its damages caused by the sale of BR50 and BR68 as crude oil.

### 2. Rollins

Ashland also contends that Rollins is strictly liable under the Louisiana products liability law. In *Weber v. Fidelity & Casualty Ins. Co.*, 250 So.2d 754 (La.1971), a case upon which Ashland primarily relies, the plaintiff sued the manufacturer of cattle dip for loss of seven cattle and his sons' illness resulting from the use of the dip. The Louisiana Supreme Court held:

A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i. e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect. (citations omitted)

If the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture or processing; for the manufacturer is presumed to know of the vices in the things he makes, whether or not he has actual knowledge of them. (250 So.2d 755, 756)

Based on this decision it is clear that the plaintiff's advantage under this cause of action is that liability attaches without the necessity of proving negligence. Upon establishing that the product was defective, the manufacturer is presumed to know the condition of the product. As the Fifth Circuit Court of Appeals stated in *Welsh v. Outboard Marine Corp.*, 481 F.2d 252 (5th Cir. 1973):

If the defendant has *actual or constructive knowledge* of the condition of the product, it would be unreasonable for him to sell it. (emphasis added)

The threshold issue is whether or not Rollins is a manufacturer or seller as defined by the Louisiana jurisprudence. The facts of the case indicate that Rollins is *not* a manufacturer for it had no participation in the making or processing of this waste material. Therefore, the key to the resolution of this question is the meaning of the term "seller" in Louisiana products liability law.

The general rule was articulated in *Penn v. Inferno Manufacturing Corp.*, 199 So.2d 210, 230 (La.App. 1st Cir. 1967):

Under Louisiana law a manufacturer is presumed to know the vices of his product and that if damage results from the sale of this product without revealing the defects to the purchaser, that the manufacturer is held liable for damages.

We submit that it is a fundamental rule of law that knowledge of the defective qualities in a thing sold can be imputed to the manufacturer thereof thereby justifying and awarding damages

---

**19.** Although Waco did not actually misrepresent the quality of the material, it was its custom to compensate Miller gaugers for so doing. This was done because Waco could get a better price for higher quality crude.

against the manufacturer. . . . *We further recognize that as a general rule the courts of this state have refused to impute such knowledge to a vendor who is not also the manufacturer of the article.* (emphasis original) (199 So.2d 214)

The court then proceeded to carve out an exception to this general rule which allowed knowledge to be imputed to a seller or dealer who was not also the manufacturer of an article when the seller or dealer labeled the goods as his own or held the goods out as having been manufactured by him.

Another exception to the above-stated general rule was recently forged by the Louisiana Supreme Court in *Chappuis v. Sears Roebuck & Co.*, 358 So.2d 926, 930 (La.1978). In that case the plaintiff was injured while working as a sheetmetal man when a fragment of steel from a hammer he was using hit him in an eye. The plaintiff had obtained the hammer from his employer's truck. Neither the plaintiff nor his employer realized that the hammer had been damaged before the accident. The hammer was manufactured by Vaughan & Bushnell, from whom Sears ordered hammers to its specifications, with Sears' name, trademark, and a warning label on the handle. The warning label was obliterated at the time of the plaintiff's injury, but when the hammer was new the fine print warning did not caution against the great danger involved in using a chipped hammer. The manufacturer knew and all the experts agreed that once chipped, a hammer should be discarded.

Addressing the issue of Sears' liability the court held:

The responsibility of Sears is the same as that of the manufacturer. First, it held the product out to the public as its own. *Penn v. Inferno Manufacturing Corp.*, 199 So.2d 210 (La.App. 1st Cir. 1967). Second, the size, volume and merchandising practices of Sears, unlike those of Reliable Motors in *Spillers v. Montgomery Ward, et al*, 282 So.2d 546 (La.App.2d Cir. 1973), bring Sears within the class of

"professional venders" who are presumed to know of the defects in their wares. See Morrow, Warranty of Quality, 14 Tul. L.Rev. 529, 539 (1940). Reliable Motors, Inc., was a relatively small truck retailer. The relationship between a retailer like Sears and its manufacturers on the other hand, with its capabilities for controlling the quality of its merchandise, justifies the imputation to Sears of knowledge of its defects. (358 So.2d 926, 930 (La.1978))

Rollins did not label the BR50 and BR68 as its own nor did it purport to have manufactured the material; therefore, it does not come within the exception of *Penn v. Inferno Manufacturing Corp.*, supra. Neither is Rollins a "professional vendor" of industrial waste as defined by the Louisiana Supreme Court in *Chappuis*. In fact, rather than being in the business of selling industrial waste products, Rollins is paid to take such material and safely dispose of it. The Court must therefore conclude that Rollins, not having come within either exception, is not a "seller" for product liability purposes. Accordingly, the theory of strict liability as seller of a defective product does not apply to Rollins.

### D. WARRANTY

#### 1. *Express Warranty*

#### (a) *Miller*

The contract between Ashland and Miller contains an express warranty of merchantability which provides, inter alia [20]

WARRANTY: Seller warrants that it is the owner of the oil to be sold and delivered hereunder and agrees to protect, indemnify and save buyer harmless from all claims made and damages suffered on account of buyer's purchase of oil from seller under this agreement. Seller guarantees and warrants that the said oil will have been produced, handled and transported in accordance with the laws, rules and regulations of all state or federal authorities having jurisdiciton thereof. Buyer warrants that the oil purchased hereunder is for resale or for processing.

---

**20.** See plaintiff's exhibit No. 15, pp. 2–3.

Miller also obligated itself in this agreement to sell only merchantable oil with B.S.&W. content not in excess of that provided for in the pipeline tariff under which the oil was to be transported, at that time one-half of one percent (½ of 1%), and to maintain accurate records and accounts of the quantity and quality of the oil purchased by it and sold to Ashland.

The evidence preponderates that each of these warranties and obligations was breached. Not only were the BR50 and BR68 sold to Ashland by Miller not fit for resale or for reprocessing, they were not fit for any purpose. The Miller gaugers were unable to ascertain the quality content of the substance because their hydrometers were rejected by the waste. Furthermore, the records maintained by Miller personnel contained falsified data on the quality of the substance purchased from Waco.

### 2. *Implied Warranty*

#### (a) *Miller and Waco*

The Mississippi legislature adopted the Uniform Commercial Code effective March 31, 1968. Ashland contends that the sections thereof dealing with implied warranty and damages form a basis for holding Waco and Miller liable for its damages:

Implied Warranty: Merchantability; Usage of Trade

(1) Unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

(3) Unless excluded or modified other implied warranties may arise from course of dealing or usage of trade. (§ 41A:2–314 Mississippi Code 1942)

Implied Warranty: Fitness for Particular Purpose.

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section [§ 2–316] an implied warranty that the goods shall be fit for such purpose. (§ 41A:2–315 Mississippi Code 1942)

Buyer's Damages for Breach in Regard to Accepted Goods

(1) Where the buyer has accepted goods and given satisfaction [See § 41A:2–607(3), providing that buyer must notify the seller of the breach within a reasonable time after the buyer discovers the breach or be barred from remedy], he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under the next

section may also be recovered. (§ 41A:2–714 Mississippi Code 1942)

Buyer's Incidental and Consequential Damages

(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, and commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(2) Consequential damages resulting from the seller's breach include

 (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

 (b) injury to person or property proximately resulting from any breach of warranty. (§ 41A:2–715 Mississippi Code 1942)

The implied warranty of merchantability was expressly provided for in the contract between Ashland and Miller. Miller and Waco breached this warranty in that the BR50 and BR68 were not merchantable crude nor any other substance that could be refined. Based on its long association with Ashland, Miller knew that the material it sold Ashland became part of Ashland's crude oil stock for Ashland's oil refinery. Waco knew that the material it sold Miller would in turn be sold to Ashland. The chemical composition of the BR50 and BR68 rendered them absolutely unfit for the purposes for which they were intended.

In *Garner v. S & S Livestock Dealers, Inc.*, 248 So.2d 783 (Miss.1971), the plaintiff purchased from the defendants eleven swine as "feeder pigs." The day after the plaintiff returned to his ranch one of the pigs died, and in succeeding days other of the pigs died of hog cholera. In all, six of the swine purchased from defendants, and 63 of plaintiff's other hogs died of cholera. The plaintiff brought suit for breach of implied warranty. After trial, the court instructed the jury as to the law on the implied warranty of fitness for a particular purpose. Commenting on the proof required under this cause of action the Mississippi Supreme Court stated:

> In order for the plaintiff to recover under the implied warranty of fitness for a particular purpose, the evidence must be sufficient for the jury to find (1) the seller at the time of the contracting had reason to know the particular purpose for which the goods were required; (2) the reliance by the plaintiff as buyer upon the skill or judgment of the seller to select suitable goods, and (3) the goods were unfit for the particular purpose. There may be cases where the two warranties of merchantability under § 41A:2–314 and fitness for a particular purpose under § 41A:2–315 arise at the same time and in the particular sale involved, but this is not such a case. (248 So.2d 785)

The warranty of fitness for a particular purpose does not apply to Waco because there was not reliance upon Waco by Ashland. In regard to Miller, however, this is such a case where both warranties of merchantability arise out of this particular sale. Miller knew that the BR50 and BR68 were being purchased by Ashland as crude oil for its refinery stock. Ashland relied upon the skill, experience, and honesty of Miller to select only crude oil as specified in the contract. That Ashland in fact placed its reliance upon Miller is evidenced by the fact that Miller was responsible for testing the material and for transporting the material to the Cranfield metering station. Miller personnel were the only people present when the waste was injected into Ashland's pipeline system. The chlorinated substance was patently unfit for crude oil stock and the oil refinement process.

Accordingly, the Court concludes that Waco is liable for breach of an implied warranty of merchantability inasmuch as the BR50 and BR68 sold by it to Miller and subsequently sold by Miller to Ashland were not fit for the ordinary purposes for which they were used. Likewise, Miller is liable

for breach of an implied warranty and also for breach of an express warranty.

### E. NEGLIGENCE PER SE

#### 1. *Creech*

Miller contends that Creech is liable for violation of 18 U.S.C. § 833, and the regulations promulgated thereunder which are found in 49 C.F.R. §§ 171–178. This argument is based upon the fact that the Creech trucks were not properly labeled. The Court finds this contention to be without merit. A close analysis of the pertinent regulations reveals that the shipper is the party responsible for properly placarding trucks carrying the hazardous material. In this case, Young was the shipper and Creech was the carrier.[21] Furthermore, the statutory source of these regulations provides liability only for one who "*knowingly* violates any such regulation." 18 U.S.C. § 834(f). The Court has found that Creech did not know the hazardous character of the substance his trucks were transporting. Therefore, he is not liable under this statute.

However, 15 U.S.C. § 1263(a) prohibits the delivery for introduction into interstate commerce of any "misbranded hazardous substance." The term "hazardous substance" represents a wide range of things from children's toys to lethal poisons and included the chlorinated substances transported in Creech's trucks. Unlike 18 U.S.C. § 834(f), the penalty provision of this statute is not limited by an intent or knowledge requirement on the part of the wrongdoer. However, 15 U.S.C. § 1264(a) does differentiate between a simple violation and an offense committed with intent to defraud or mislead, the former being a misdemeanor and the latter being a felony.

Notwithstanding the above federal regulations of interstate commerce, this Court is persuaded that Creech was not negligent. Even if the Court were to conclude the absence of federally required labels did amount to negligence on behalf of Creech, this act was not a substantial factor in causing the damage which Ashland seeks to recover. Accordingly, the Court holds that no liability attaches to Creech in this matter.

### F. NEGLIGENCE

The conduct of Rollins, Young, Waco and Miller constituted negligence. As discussed above, the activities of each of these defendants represent a serious departure from standards of ordinary care or reasonableness, and each defendant's participation was a proximate cause of Ashland's damages.

### G. INSURANCE COVERAGE

#### 1. *Rollins*

The liability insurer of Rollins, Insurance Company of North America, hereinafter referred to as I.N.A., has asserted coverage defenses on the following grounds:

(a) the events which led to this action were not an occurrence as defined by the I.N.A. policy of insurance;

(b) the actions of Rollins were too remote from the Ashland damage to be the legal, proximate cause thereof; and

(c) the pollution/contamination exclusion of the I.N.A. policy precludes coverage for damages to Ashland.

For the following reasons, the Court concludes that I.N.A. has a valid policy defense under ground (a), supra.

I.N.A. agreed to indemnify Rollins for losses caused by an "occurrence," which is defined in the policy as:

OCCURRENCE: means an accident or series of accidents arising from one event or exposure of persons or property to conditions which results, during the policy period, in personal injury or property damage; provided such personal injury or property damage is neither expected nor intended by the Insured.

Thus the question which the Court must resolve is whether the damage suffered by Ashland and occasioned by the misconduct of Rollins was caused by an accident or

---

**21.** See 49 C.F.R. § 173.404(a) and 49 C.F.R. § 177.815(a).

series of accidents, the result of which was neither expected nor intended.

The facts as found by this Court which are central to this determination are:

(1) Rollins was cognizant of the destructive properties of the BR50 and BR68;

(2) Rollins sought to conceal its involvement in the disposal of these substances by requiring a commitment of secrecy from Young;

(3) Rollins' plan to rid itself of the BR50 and BR68 was authorized if not conceived, by its vice president, Mr. Alsentzer, who was dispatched from Rollins' home office to handle the situation;

(4) Contemporaneously with the execution of this plan, Mr. Alsentzer issued a memorandum to, among others, the president of Rollins, Mr. Brooking, and the key personnel at the Baton Rouge facility, notifying them that the material was to be "mixed with crude stock for discharge into pipeline." This memorandum further instructed strict secrecy and compliance; and

(5) Mr. Hamm, Rollins' chief chemist at the Baton Rouge plant, knew that the waste was to be injected into a crude oil pipeline and ultimately reach a refinery. He cautioned various officials of the obvious danger involved.

The net result of these documented facts is that Rollins, an expert in the handling of dangerous chemical waste, knew that these substances would contaminate crude oil and cause corrosive damage. Nevertheless, because the material had the visual appearance of certain types of crude oil, Rollins felt that it could be mixed with crude oil without detection. The manifestation of the dangerous character of the BR50 and BR68 was a possibility that Rollins expected. This expectation is the most plausible explanation of Rollins' efforts to conceal the source of the material.

Ashland and Rollins contend that the policy defense of I.N.A. is without merit because of the jurisprudential rule that the

insurer of an employer or corporation can be liable under its policy for intentional acts of the insured's employees. In support of this argument Ashland and Rollins cite *Rivers v. Brown*, 168 So.2d 400 (La.App. 3d Cir. 1964). In that case the plaintiff was assaulted by the president and principal stockholder of a construction company, which was the named insured on a liability policy, because he had damaged the work completed by the company. Upon witnessing this act by the plaintiff, the president struck the plaintiff. The court held that this act was covered by the insurance policy because the assault was not committed "by or at the direction of the insured" within an exclusion of the policy.

A similar result was obtained in *Baltzar v. Williams*, 254 So.2d 470 (La.App. 3d Cir. 1971), wherein the plaintiff, an arrestee, filed suit against the deputy town marshal of Glenmora, Louisiana, and Glenmora's liability insurer for injuries sustained during an illegal arrest by a deputy town marshal wielding a firearm. The issue before the court was whether the policy of insurance excluded coverage of intentional wrongful acts committed by employees of the town. The policy provided coverage for an "occurrence" which was defined in the policy as:

> ... an accident including injurious exposure to condition which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured. (254 So.2d at 472)

Concluding that the shooting was an accident, neither expected nor intended, the court held that the Town of Glenmora was covered under the policy. In so holding the court stated:

> Since the town is insured in this instance, the determination of whether or not the shooting was an accident must be interpreted from the standpoint of the Town of Glenmora. The answer to this question is almost obvious, in that the Town of Glenmora did not intend or expect that its deputy would commit an intentional

violent act upon a citizen. (254 So.2d 472) [22]

In dictum, the court in *Home Insurance Co. v. Degelos Brothers Grain Corp.*, 315 So.2d 74 (La.App. 4th Cir. 1975), discussed in greater detail below, recognized the same distinction between an intentional negligent act of an officer or employee of an insured corporation, and an intentional act of the insured corporation. The court states that the former is covered under the policy of the insured corporation, and the clear implication is that the latter is excluded.

Of the cases relied upon by Ashland and Rollins the *Rivers* case most nearly approaches the facts of the matter presently before the Court. However, they are distinguishable and the distinction is determinative. Unlike the cases cited by Ashland and Rollins, this case does not involve the unauthorized intentional act of an individual employee or officer of Rollins; on the contrary, it involves the authorized intentional act of Rollins itself. The highest officers and important personnel of Rollins were privy to this disposal operation. This was not a reflexive reaction by one of Rollins' many limbs, but rather the deliberate execution of a preconcerted plan, conceived in the mind of Rollins and carried out by a central system of key Rollins personnel. The intent to dispose of the waste in the manner detailed above was most definitely that of Rollins, the named insured.

Ashland and Rollins also argue that even if Rollins intended to dispose of the waste, since it did not intend the result or injury, its act is deemed accidental and coverage is afforded for its act. This hypothesis overlooks the legal principle that Rollins is responsible for the rational and probable consequences of its act. Rollins rejoins that if it had in fact intended or expected to cause damage, albeit less than actually resulted, then it would be responsible for the "full consequences" of its intended act. However, Rollins denies that it ever intended or

expected damages to flow from its actions. The Court disagrees; the evidence not only indicates that the collective awareness of Rollins must have perceived the results of its activity, but that Rollins in fact expected the consequences of its actions, and in anticipation thereof planned accordingly. This is the most reasonable conclusion to be drawn from the fact that although Rollins knew the dangerous propensities of these substances, having itself experienced the damaging effect of the corrosive chloride material, it nevertheless planned to discharge the material into a crude oil pipeline. It is clear that Rollins intended to, and did, inject the BR50 and BR68 into a crude oil pipeline knowing that they were dangerous chemical waste products that would contaminate crude oil stock.

In *Home Insurance Co. v. Degelos Brothers Grain Corp.*, 315 So.2d 74 (La.App. 4th Cir. 1975), a case cited by Rollins, Drexel Radio Company sustained water damage while a grain fire was being brought under control in the adjoining storage compartment in the Public Commodity Warehouse in the city of New Orleans. Subrogated to Drexel's rights upon paying the claim, Home Insurance Company filed suit against defendant, lessees of the storage space where the fire originated, and its liability insurer. The court held that the fire originated through the negligence of defendant's agent. However, the defendant's insurer denied coverage on the basis of its contention that the damage did not arise from an "occurrence" defined in the policy as:

> ... an accident, including injurious exposure to conditions, which results ... in ... property damage neither *expected nor intended* from the standpoint of the insured. (emphasis original)

The court cast the issue in the following terms:

> In deciding whether there is coverage, we must consider whether the original catastrophic happening was intended or expected, not the damage caused as a conse-

---

**22.** In *McBride v. Lyles*, 303 So.2d 795 (La.App. 3d Cir. 1974) the court reached the same con-

clusion.

quence of attempting to confine the fire and minimize the damage it caused.

The policy defense was rejected. The court determined that the fire, the original happening, was not the intentional act of the insured but was rather unexpected and unintentional. Therefore, the water damage which resulted from the effort of one of the defendant's employees to contain the fire was not an independent "occurrence."

As applied to the instant matter, this Court concludes that the original act of selling these substances into interstate commerce as crude oil with the intention that it be discharged into a pipeline system was precisely what Rollins intended. Furthermore, the damage caused to Ashland as a legal consequence of this original act was expected.

For the foregoing reasons, the Court concludes that the policy of insurance issued by I.N.A. to Rollins excludes coverage for the damage occasioned to Ashland by Rollins in this matter. Therefore, I.N.A. has asserted a valid coverage defense.[23]

### H. PUNITIVE DAMAGES

#### 1. *Rollins*

 The jurisprudence of Louisiana has uniformly denied recovery of punitive, vindictive, or exemplary damages. *Baggett v. Richardson*, 473 F.2d 863 (5th Cir. 1973); *Commercial Union Insurance Co. v. Upjohn Co.*, 409 F.Supp. 453 (W.D.La.1976); *Fassitt v. United T.V. Rental, Inc.*, 297 So.2d 283 (La.App. 3d Cir., 1974) and *Boutte v. Hargrove*, 277 So.2d 757 (La.App. 4th Cir. 1973). Accordingly, Ashland's claim for punitive damages against Rollins must be denied.

#### 2. *Miller*

 Under Mississippi law punitive damages are permissible. In *Woodall v. Ross*, 317 So.2d 892 (Miss.S.Ct.1975) the defendant claimed to have acquired title to a 13-acre tract of land by adverse possession.

However, the court found the jury to be eminently correct in rejecting this claim of recent fabrication, and further found that the defendant intentionally went onto the plaintiff's property and bulldozed all the trees therefrom. The Mississippi Supreme Court sustained the award of $1,462.50 for actual damages and reversed the lower court's action in setting aside the $2,000.00 verdict representing punitive damages. In so doing the Court made the following observations about the standard for determining what punitive damages are proper:

In *Illinois Central Railroad Company v. Ramsay*, 157 Miss. 83, 127 So. 725 (1930), this Court said:

"To authorize the infliction of punitive damages, the wrongful act complained of must either be intentional, or result from such gross disregard of the rights of the complaining party as amounts to willfulness on the part of the wrongdoer. (157 Miss. at 87, 127 So. at 726)."

In *Snowden v. Osborne*, 269 So.2d 858 (Miss.1972), this Court held:

"Exemplary or punitive damages are those, of course, which are in addition to the actual or compensatory settlement. They are granted in the nature of punishment for the wrongdoing of the defendant and as an example so that others may be deterred from the commission of similar offenses thereby in theory protecting the public. (269 So.2d at 860)."

The Court has repeatedly stated the rule of law that punitive damages may be recovered where there is malice, fraud, oppression, willful wrong or gross negligence. See *Greyhound Corp. v. Townsend*, 234 Miss. 839, 108 So.2d 208 (1959); *Bradley v. Associates Discount Corp.*, 230 Miss. 131, 92 So.2d 468 (1957); *Bounds v. Watts*, 159 Miss. 307, 131 So. 804 (1931); *Yazoo & Miss. Valley Railroad Co. v. Mullen*, 158 Miss. 774, 131 So. 101 (1930); *Illinois Central Railroad Co. v. Ramsay*,

---

**23.** The Court notes that neither the Travelers Indemnity Company, the primary liability insurer of Miller, nor Continental Casualty Company, Miller's excess liability insurer, have as-serted coverage defenses. Both policies cover sums paid as damages in settlement of a claim or in satisfaction of a judgment for which the insured is legally liable.

157 Miss. 83, 127 So. 725 (1930). (317 So.2d 895, 896)

This standard was recently reaffirmed by the appellate court for the Fifth Circuit in *Dunn v. Koehring Co.*, 546 F.2d 1193 (5th Cir. 1977), wherein the Court ruled:

> Mississippi law authorizes punitive damages if the wrongful conduct is intentional or if it results from such gross disregard for the rights of the complaining party as to amount to willfulness on the part of the wrongdoer. (citation omitted)

The Court concludes that punitive damages are allowable under the law of Mississippi. Inasmuch as all issues pertaining to damages have been reserved for trial at a later date, the Court believes that it would be more appropriate to reserve its decision concerning the actual allowance, and amount, if any, of such punitive damages against Young, Miller and Mrs. E. A. Waldrop (substituted for Waco) for consideration along with other damage issues.

## CONCLUSION

Accordingly, IT IS ORDERED that trial of the issues of damages be scheduled and held and that after such trial judgment be entered in accordance with this decision in favor of the plaintiff, Ashland Oil, Inc., and against (i) Rollins-Purle, Inc.; (ii) Larry Young and Alan Petroleum, Inc.; (iii) Mrs. E. A. Waldrop; and (iv) Miller Oil Purchasing Company and its insurer, Continental Casualty Company, said defendants to be liable jointly and *in solido*, except with regard to such punitive damages as may be levied against the latter three named defendants.

IT IS FURTHER ORDERED that said judgment shall be entered in favor of the defendant, Glideville L. Creech, dismissing the claim of Ashland Oil, Inc., against him, and in favor of the third party defendants, Insurance Company of North America, Ashland Oil Purchasing Company and Ashland Oil Pipeline Company, dismissing the third party claims against them.

## APPENDIX "B"

JACK M. GORDON, District Judge.

## AMENDMENT TO FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter is before the Court on the motion of Philip Alan Froude, Excess Insurance Company, National Casualty Company and Andrew Weir Insurance Company, as nominees and substitutes for certain underwriters at Lloyds and British Insurance Companies, hereinafter referred to as "the Companies," to amend the findings of fact and conclusions of law rendered in this case on June 5, 1979.

Based upon this Court's holding in regard to the coverage defense of Insurance Company of North America, hereinafter referred to as "INA," the primary insurer of Rollins Environmental Services, Inc., hereinafter referred to as "Rollins," the Companies, who are the umbrella insurance carriers of Rollins, seek to have the judgment amended so as to include judgment in their favor.

For the following reasons, the Court denies the motion and orders that judgment be entered in favor of the third party plaintiff Rollins and against the third party defendant Companies.

The Court's holding in regard to INA was predicated on the provisions of the primary liability policy wherein INA agreed to indemnify Rollins for damages caused by an "occurrence," which was defined as:

> "Occurrence: means an accident or series of accidents arising from one event or exposure of persons or property to conditions which result, during the policy period, in personal injury or property damage; provided such personal injury or property damage is neither expected nor intended by the insured.

The pivotal language in this definition is "provided such ... property damage is neither expected nor intended by the insured." The Court has previously addressed the issue of whether or not Rollins, the insured, expected or intended such damage, and concluded:

... that the original act of selling these substances into interstate commerce as crude oil with the intention that it be discharged into a pipeline system was precisely what Rollins intended. Furthermore, the damage caused to Ashland as a legal consequence of this original act was expected.

Because the primary policy specifically provided that the determination of whether the damage was expected or intended was to be judged from the standpoint of the insured, the Court concluded that INA had asserted a valid coverage defense.

The umbrella policy No. CX1843 [1] defines "occurrence" as follows:

> The term "occurrence" wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which *unexpectedly and unintentionally* result in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premise location shall be deemed one occurrence. (emphasis added)

 A comparison of the definition of "occurrence" contained in the primary liability policy with the definition of that term in the umbrella policy reveals an important distinction: the former specified that the occurrence must be accidental from the vantage point of the insured, whereas the latter does not delineate whether the occurrence is to be viewed from the perspective of the insured or the damaged party. In the absence of a policy declaration that the occurrence is to be evaluated from the

viewpoint of the insured, the jurisprudence of Louisiana uniformly holds that it must be viewed from the standpoint of the damaged party.

This issue was originally decided by the Court of Appeals for the Fifth Circuit in *Jernigan v. Allstate Insurance Co.*, 269 F.2d 353 (5th Cir. 1959). The Court capsulized the district court's findings of fact which were based upon a stipulation of the parties:

> ... that [Adams] deliberately and maliciously drove the automobile against Jernigan and operated it back and forth over the prostrate body inflicting serious injuries resulting in his death .... (269 F.2d at 355)

The question of law raised by this incident was whether the deliberate commission of an assault comes within the coverage of the policy as being a bodily injury "caused by accident." Inasmuch as the courts of Louisiana had not addressed this question [2] the Court held:

> ... under the general law which the courts of Louisiana would probably follow, the injury and property damage were caused by accident .... (269 F.2d at 355)

This decision aligned Louisiana with the majority view which held that the determination of whether damages are caused by "accident" must be made from the standpoint of the damaged party rather than from that of the party committing the tort.

> On rehearing, the court underscored its decision by stating:
> Specifically, therefore, the court below and we were called upon to decide whether that term [accident] embraced a deliberate assault not provoked by the assaultee.

---

1. Excess Umbrella Policy No. CX 1844 and CX 1845 provide:

 This policy is subject to the same terms, definitions, exclusions and conditions (... except as otherwise provided herein) as are contained in or as may be added to the Underlying Umbrella Policies stated in Item 2 of The Declarations prior to the happening of an occurrence for which claim is made hereunder.

 Item 2 of the Declarations mentions only Umbrella Policy No. CX 1843. Neither Excess

Umbrella Policy No. CX 1844 nor CX 1845 contains provisions which contradict the pertinent provisions of Umbrella Policy No. CX 1843.

 See Joint Exhibit No. 43.

2. Lacking judicial guidance, the *Jernigan* court took cognizance of Louisiana's "unusual liberality in favor of its injured citizens in their claims against insurance carriers growing out of torts committed in the state." (269 F.2d at 356–357)

The answer to that question was yes. The law had written into the policy a provision of this import:

The word "accident" as herein used shall be construed from the standpoint of the person injured and shall include unprovoked assaults.

That provision of the policy "is as effectually one of its terms—as if it had been plainly expressed." We recently stated: "Of course, the existing law, including judicial precedents, must be read into all contracts." (footnotes omitted) [272 F.2d 857, at 858 (5th Cir. 1959)].

The *Jernigan* decision was an accurate prognostication of the course of Louisiana jurisprudence.[3]

Observing the facts of the instant case from the standpoint of Ashland, the Court finds that Ashland never anticipated the resulting contamination of its crude oil stock and damage to its refinery from what it justifiably believed to be a routine purchase of crude oil. Rollins' covert attempt to dispose of the hazardous waste products BR50 and BR68 by discharging it into an interstate pipeline was unforeseen and unexpected by Ashland.

In the absence of a policy declaration that the occurrence must be accidental from the standpoint of the insured, the Court must evaluate the occurrence from the perspective of the damaged party. Thus, having found that Ashland neither expected nor intended the property damage it sustained, the Court is constrained to conclude Ashland's loss was the result of an "occurrence" within the meaning of the umbrella liability policies CX 1843, CX 1844 and CX 1845.[4]

## CONCLUSION

Accordingly, IT IS ORDERED that the judgment in this matter is hereby AMENDED so as to provide that TRIAL on the issue of damages be scheduled and held and that after such trial judgment be entered in accordance with this decision in favor of the plaintiff, Ashland Oil, Inc., and against (i) Rollins-Purle, Inc., and its Umbrella Excess Liability Underwriters Philip Alan Froude, Excess Insurance Company, National Casualty Company and Andrew Weir Insurance Company; (ii) Larry Young and Alan Petroleum, Inc.; (iii) Mrs. E. A. Waldrop; and (iv) Miller Oil Purchasing Company and its insurer, Continental Casualty Company, said defendants to be liable jointly and in *solido*, except with regard to such punitive damages as may be levied against the latter three named defendants.

---

**3.** See, *Lombard v. Sewerage & Water Board of N.O.*, 284 So.2d 905 (La.1973); *Knight v. L. H. Bossier, Inc.*, 118 So.2d 700 (La.App. 1st Cir. 1960); *Audubon Coin & Stamp Company v. Alford Safe & Lock Co.*, 230 So.2d 278 (La.App. 1st Cir. 1969); *West v. City of Ville Platte*, 237 So.2d 730 (La.App.3d Cir. 1970).

**4.** Although not specifically asserted by the Companies, the Court further holds that the Companies may not adopt by reference INA's definition of "occurrence" since it was not attached or physically made a part of the umbrella excess liability policy. *Spain v. Travelers Insurance Co.*, 332 So.2d 827 (La.1976).