VALUE PARTNERS S.A., Societe Anonyme Holding and Value Partners Brasil S/C LTDA, Plaintiffs,

v.

BAIN & COMPANY, INC., Defendants.

No. 98–CV–11730–MEL.

United States District Court,
D. Massachusetts.

Jan. 16, 2003.

---

Benjamin E. Marks, Weil, Gotshall & Manges LLP, New York City, Edward P. Leibensperger, Nutter, McClennen & Fish, LLP, Boston, MA, for Plaintiffs.

Lisa M. Asiaf, Joseph L. Kociubes, Mark W. Batten, Bingham McCutchen LLP, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER

LASKER, District Judge.

Value Partners S.A., Societe Anonyme Holding, a Luxembourg corporation, and Value Partners Brasil S/C Ltda, its Brazilian subsidiary (collectively "Value Partners") brought suit against Bain & Company ("Bain"), a Massachusetts corporation, alleging aiding and abetting a breach of fiduciary duty (Count I); tortious interference with existing business relationships (Count II); tortious interference with prospective business relationships (Count III); theft of trade secrets in violation of M.G.L. ch. 93, § 42 (Count IV); and engaging in unfair business practices in violation of M.G.L. ch. 93A (Count V). The parties agree that Brazilian law governs the first three counts.

Bain moved for summary judgment on all claims and moved in limine to apply Brazilian law to the entire case. In a Memorandum and Order of October 9, 2002, summary judgment was denied as to Counts I, II, and III, and granted as to Count IV on the ground that Brazilian law governed the claim for use and disclosure of trade secrets. Because the Court is the ultimate fact finder for claims arising under Chapter 93A, *Nei v. Burley*, 388 Mass. 307, 315, 446 N.E.2d 674, 679 (1983), judg-

ment was reserved on Count V until after evidence was presented at trial. Bain's choice of law motion was granted as to Count IV and denied as to Count V.

Before the trial began, I informed counsel that, based on the affidavits of the parties' expert witnesses on Brazilian law and the testimony of Value ·Partners' expert witness,[1] I found that Value Partners had not established the existence of a cause of action under Brazilian law for aiding and abetting a breach of fiduciary duty. However, I allowed counsel to proceed on a theory of unfair competition under Article 195 of Brazil's Industrial Property Law (Law 9.279 of May 14, 1996). Following a nineteen-day trial, the jury found unanimously in response to special interrogatories that Bain (1) unfairly competed with Value Partners and (2) tortiously interfered with Value Partners' existing or prospective contracts. The jury awarded Value Partners damages in the amount of $10,000,000.

Value Partners is entitled to judgment on the verdict for compensatory damages of $10,000,000 plus court costs. Before directing entry of final judgment, however, it is necessary to determine whether a chapter 93A remedy is available to Value Partners and, if so, in what form and amount.

I conclude that chapter 93A is not applicable to this action. Summary judgment is thus GRANTED on Count V.

## II.

Value Partners is a Milan-based international consulting firm. In 1994, Value Partners opened a subsidiary in Sao Paolo, Brazil, and assigned Andre Castellini, a Value Partners manager, to run the office and act as the managing director. Shortly thereafter, Giovanni Fiorentino and Marco Petruzzi, both founding members of Value Partners, were transferred from Milan to the Sao Paolo office and were made principals of Value Partners–Brazil.[2] Between 1994 and the end of 1997, the Sao Paolo office grew in size to over twenty professionals, producing gross sales of approximately five million dollars annually.

In early 1997, Fiorentino and Petruzzi became dissatisfied with their jobs at Value Partners, and decided to look for employment elsewhere. Upon obtaining an offer from a Brazilian management consulting firm in the spring of 1997, they went together to Castellini's apartment one evening to inform him of their impending departure. They invited Castellini to join them and he agreed. Together, the three decided to set their sights higher than the Brazilian firm that had already extended an offer, and began approaching international firms, including Boston Consulting Group and Monitor. In late May or early June, a headhunter telephoned Giovanni Cagnoli, a partner in Bain's Milan office, to say that the three were leaving Value Partners. Cagnoli then contacted them. At their request, Cagnoli put them in touch with Tom Tierney, Bain's worldwide manager, whose office is in Boston.

The three Brazilian partners[3] had drafted a document entitled the "Newco

1. Following the testimony of Value Partners' expert witness, Jacques Labrunie, Bain withdrew its own expert witness, Roberto Unger.

2. In the Value Partners hierarchy, principals are senior staff members but have no equity share.

3. I use this description loosely. Although all were living and working in Brazil at the time, only Castellini was a Brazilian citizen. Likewise, only Castellini had a (minimal) equity share of the company. Fiorentino and Petruzzi, who held the job title of "principal," were thus not necessarily partners in a legal sense but rather in the sense that they joined

Business Plan," which they were using to solicit firms. The three sent this document to Cagnoli and subsequently to Bain executives in Boston. It went through various drafts, with suggestions from Cagnoli incorporated along the way. A section entitled "Newco's Objectives and Expectations" reveals that their aim was considerably more expansive than merely securing new positions for themselves. It began as follows: "The Principals of VP Brazil want to merge the Brazilian practice with a leading top management consulting firm. They are highly confident that all the staff will follow them." (Pl.'s Exh. 13, at 8.) In the original draft sent to Cagnoli, it went on to say that "[t]he Principals believe their practice to be worth approximately US$10 million, given their standalone [sic] cash generation capacity." (*Id.* at 9.) It proposed an acquisition deal that would include a payment to the three partners of four million dollars, a "substantial part" of which was to be used to "honor the commitments with Blocker S.A.,[4] legal settlement and transition costs (loss of [19]97 compensation, sign-up bonus for staff, etc.)." (*Id.*)

Included in the plan was general information about Value Partners' revenues and about the qualifications of the staff. (*Id.* at 5–7.) A revised version added detailed information about the work histories and job qualifications of not only the three partners but the rest of the professional staff as well, identified only by their initials. (Pl.'s Exh. 16, at B 897–901, B 904, B 906–912.) Under the heading " 'Spin-In' Process," the following steps were listed with approximate dates: Negotiate/Agree with Acquiror; Set-up Newco: Phase I (July 30th); Communicate to Staff (August 20th); Communicate to key clients (August 21). The final step, projected for September 1, was "Communicate to [Value Partners headquarters in] Milan". (Pl. Exh. 13, at 12.) Next to this timeline was a list of "Key issues to address" for each stage. Linked to Phase I was a long list of tasks including "Docs ... back ups and Staff resignation/hiring letter." Linked to the final step of communicating with Milan was one issue: "Purchase vs. Closure [of Value Partners' practice]." (*Id.*)

Over the next several months, the three negotiated with Bain. They meanwhile continued to negotiate with other firms. Bain sent a representative, Harry Strachan, to Brazil, and flew the three partners to Boston for interviews.

During the summer, as projected in the earlier draft of the Newco plan, Castellini secured authorization from Milan to pay an unprecedented mid-year bonus, equal to half of the minimum bonus established for the year, to the staff of Value Partners–Brazil. It is apparently common for Brazilian businesses, upon hiring new staff, to pay them the year-end bonuses they have forfeited in leaving their previous job.

On September 11–12, 1997, Bain's Policy Committee (its chief decision-making body) met in Carmel, California. The minutes from that meeting reflect a decision to "continue to negotiate the hiring of the Brazilian partners (and their staff) ...." (Pl.'s Exh. 38, at 2.) On September 16, 1997, the three Brazilians—by this point

together with Castellini to pursue the venture that is described here.

4. "Blocker SA" refers to a contract between Value Partners–Brazil and Robert Blocker. Blocker, a well-known member of the Sao Paolo business community and an old family friend of Castellini, had entered an agreement with VP–Brazil soon after it formed. Under the agreement, Blocker was to provide VP–Brazil with introductions to potential clients, and was to receive fees according to how much business was generated, with the possibility of an additional fee to be paid at the end of the five-year period.

joined by a fourth, Marcelo Buazar, who was an independent contractor overseeing the administration of Value Partners' Sao Paolo office—faxed Bain the first draft of a "Master Plan of Implementation" detailing the tasks to be carried out, including renting an office, communicating to various categories of staff, and informing clients. (Pl.'s Exh. 39, at 5–6.)

On October 16, 1997, Castellini, acting on behalf of the threesome, signed a two-page agreement with Bain setting forth the basic terms under which the three would leave Value Partners and join Bain. The agreement began by stating: "Bain is not buying a business, it is hiring a number of highly-qualified new staff who can bring capabilities and contacts to assist Bain in building its Brazilian operations." (Pl.'s Exh. 52.) It provided that the three were to join Bain as Vice Presidents and be compensated according to the standard Bain compensation system. (*Id.*) Castellini was promised a signing bonus of $300,000, and Petruzzi and Fiorentino were promised bonuses of $150,000 each. (*Id.*) Castellini was authorized to hire Value Partners staff at their current compensation level and to provide them with signing bonuses. (*Id.*)

On the same day, Bain entered into an agreement with Robert Blocker, assuming a portion of Value Partners' obligations under its contract and setting out the terms of a similar agreement under which Blocker was to provide client introductions to Bain–Brazil in return for a portion of the revenues generated. (Pl.'s Exh. 53.)

Over the course of the month of October, the three partners, along with Buazar, rented office space in Sao Paolo and made other logistical arrangements for the move. Toward the end of the month, they began speaking with the staff one by one, advising them that they were planning to leave Value Partners.

On October 31, 1997, the three partners called Value Partners founder and managing director Georgio Rossi Cairo in Milan, and told him that they were leaving. The next day, they held a meeting at the new offices of Bain–Brazil with most of the Value Partners staff, and invited them to join Bain. Many did so immediately, with a number of others following over the course of the following few weeks. Ultimately, all but a handful of Value Partners employees went to work for Bain. In the course of the transition, a large number of Value Partners documents were taken to the new Bain office, including internal documents with information about clients, projects, staff, and revenues, and various documents and proposals relating to client projects. At least one client proposal was later reproduced in its entirety on Bain letterhead. (Pl.'s Exh. 59; Pl.'s Exh. 61.)

## III.

Section 11 of Chapter 93A provides:

Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice . . . may . . . bring an action . . . for damages and such equitable relief . . . as the court deems to be necessary and proper.

.    .    .    .    .

No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition occurred primarily and substantially within the commonwealth. For the purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not

occur primarily and substantially within the commonwealth.

M.G.L. ch. 93A, § 11.

Two questions must be decided: (1) whether chapter 93A applies to this action under choice of law principles, and (2) if so, whether the wrongful acts which Bain committed occurred "primarily and substantially" within Massachusetts.

### A. Choice of Law

█ A plaintiff may bring claims under Massachusetts law even where other claims in the same case are governed by the law of a different jurisdiction. *See Putnam Resources v. Pateman,* 958 F.2d 448, 465 (citations omitted)(describing the principle of depecage as "the framework under which different issues in a single case ... may be decided according to the substantive law of different states"); *see also Restatement (Second) of Conflict of Laws,* § 145, comment d (1971) ("The courts have long recognized that they are not bound to decide all issues under the local law of a single state ....."). In the chapter 93A context, such an analysis has most often arisen where chapter 93A claims, sounding in tort,[5] are governed by different choice of law principles than those governing contract claims in the same case. *See, e.g., Computer Sys. Eng'g, Inc. v. Qantel Corp.,* 571 F.Supp. 1365, 1371, *aff'd,* 740 F.2d 59, 70 (1st Cir. 1984) (contract claims governed by California law and chapter 93A claim by Massachusetts law); *First Sec. Bank, N.A. v. Northwest Airlines, Inc.,* 2001 WL 92175, at *3 (D.Mass. Jan. 3, 2001) (contract claims governed by Minnesota law and chapter 93A claim by Massachusetts law). Where a chapter 93A claim is essentially

contract-based, however, arguments to bifurcate the choice of law analysis have not prevailed. *See, e.g., Northeast Data Sys. v. McDonnell Douglas Computer,* 986 F.2d 607, 609–10(1st Cir.1993) (contract provision selecting California law to govern actions arising from the contract bars assertion of chapter 93A claims that are essentially contract claims); *Worldwide Commodities, Inc. v. Amicone Co.,* 36 Mass.App.Ct. 304, 308, 630 N.E.2d 615, 617–18 (following *Northeast Data* ).

█ The case at bar presents yet a third variation on this theme: tort claims under Brazilian law and a chapter 93A claim that is unmistakably tort-like in appearance. This configuration leads into relatively uncharted territory. It appears that no state or federal court sitting in Massachusetts has confronted the possibility of applying Massachusetts law to a tort-based chapter 93A claim while simultaneously applying foreign law to other tort claims arising from the same nucleus of facts. The only court to have done so, the Court of Appeals for the Eleventh Circuit, stopped short of answering the choice of law question. In *Camp Creek Hospitality v. Sheraton Franchise Corp.,* 139 F.3d 1396 (11th Cir.1998), a case involving a Georgia franchise that sued its Massachusetts-based franchisor alleging a myriad of statutory and common law claims, Massachusetts law governed the plaintiff's contract claims and Georgia law governed its claim of tortious interference with contract and business relations and misappropriation of trade secrets. In reviewing the district court's grant of summary judgment on the plaintiff's claims under chapter 93A, the Court of Appeals found that the acts in question did not

---

**5.** *See Crellin Technologies, Inc. v. Equipmentlease Corp.,* 18 F.3d 1, 11 (1st Cir.1994) ("[W]hen a chapter 93A claim and the requested remedy are highly analogous to a tort claim and remedy, the chapter 93A claim should be considered as a tort for choice-of-law purposes.") (citations omitted).

occur "primarily and substantially" in Massachusetts, and that the chapter 93A claim was thus not applicable. It held that the "application of this express limitation found in the act renders unnecessary any determination of whether a Georgia court, applying Georgia principles of conflicts of law, would apply the Massachusetts Act at all." *Camp Creek,* 139 F.3d at 1410 n. 23.

Although none of these cases directly resolves the present case, together they shed a great deal of light on the path to follow.

In a choice of law analysis, the first question is whether a conflict of law actually arises. *Millipore Corp. v. Travelers Indem. Co.,* 115 F.3d 21, 29 (1st Cir.1997). Value Partners contends that there is no "choice" to be made here; rather, it urges, the only question is whether it is entitled to the "additional and different remedies" provided by the Massachusetts legislature under chapter 93A. Value Partners argues that in enacting chapter 93A, the Massachusetts legislature's purpose was simply to provide plaintiffs with the possibility of double or treble damages and attorneys' fees, and that chapter 93A is thus additional to, rather than in conflict with, any remedy under a foreign jurisdiction.

Under the preliminary consideration given to this question before trial, it appeared that no conflict arose. However, upon deeper consideration, I find Value Partners' argument unpersuasive. In its discussion of choice of law in *Millipore,* the First Circuit distinguished between two counts of the complaint, noting that "[c]ount II alleges [a violation of chapter 93A and] and therefore the question is not which state's laws apply, but whether plaintiff has created a genuine issue of material fact as to whether [chapter 93A is] applicable here." *Millipore,* 115 F.3d at 29 n. 14. However, in *Crellin Technologies, Inc. v. Equipmentlease Corp.,* 18 F.3d

1 (1st Cir.1994), decided three years before *Millipore,* the court concluded that Rhode Island had the greater interest in a dispute between a Rhode Island lender and a Massachusetts creditor, and that "to the extent appellant presents a potentially viable unfair trade practices claim, the claim is governed by the substantive law of Rhode Island. Because that is so, appellant's claim under chapter 93A is not actionable." *Crellin,* 18 F.3d at 13. Any ambiguity in the *Millipore* footnote notwithstanding, *Crellin* makes clear that 93A claims are not exempt from choice of law analysis.

A brief look at Brazilian and Massachusetts law in this area reveals that there are substantial differences between the two. Chapter 93A outlaws "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." M.G.L. ch. 93A, § 2(a). To establish such a claim, a plaintiff must show that the defendant's actions fall "within at least the penumbra of some common-law, statutory, or other established concept of unfairness, or are immoral, unethical, oppressive, or unscrupulous and resulted in substantial injury to ... other businessmen." *Quaker State Oil Refining Corp. v. Garrity Oil Co.,* 884 F.2d 1510, 1513 (1st Cir.1989) (citations omitted). Article 195 of Brazil's Industrial Property Law (Law 9.279 of May 14, 1996) is considerably narrower in scope, delineating specific practices that constitute unfair competition. For present purposes, the most significant portions provide that a crime of unfair competition is committed by one who:

IX   gives or promises money or other utility to the employee of a competitor, whereby that employee, in failing in his duty in his employment, provides him with an advantage;

.   .   .   .   .

XI   discloses, exploits or uses, without authorization, confidential knowledge, information or data, usable in industry, commerce or the providing of services, excepting that which is of public knowledge or which is obvious to a person skilled in the art, to which he had access by means of a contractual or employment relationship, even after the termination of the contract;

XII   discloses, exploits or uses, without authorization, knowledge or information as mentioned in the previous item, when obtained directly or indirectly by illicit means or to which he has had access by fraud

. . . .

(Exh. B to Expert Declaration of Jacques Labrunie.) These differences are arguably not decisive in the present case, since the conduct at issue here is potentially actionable (other considerations aside) under both the narrower and broader definitions. However, chapter 93A provides for double or treble damages if the acts were willful, as well as for attorneys fees. M.G.L. ch. 93A § 11. In contrast, Brazilian law provides only for compensatory damages. (Testimony of Jacques Labrunie, October 22, 2002, at 29–30.)

The parties are in agreement that Brazilian law governs the first three counts of Value Partners' complaint. As described above, on the eve of trial, Count I was effectively amended to allege unfair competition under Article 195 rather than, as originally drafted, aiding and abetting a breach of fiduciary duty. It would appear, then, that the question of which law governs the unfair competition claim has already been answered by the agreement of the parties to try this claim under Brazilian law.

Under a choice of law analysis, the result would be the same. In a diversity action, federal courts apply the choice of law rules of the state in which they sit. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Massachusetts courts. take a flexible interest-based approach to choice of laws issues. *See Millipore*, 115 F.3d at 30 (citation omitted). This approach draws on both the specific and general factors listed in the *Restatement*. The specific factors to be considered in tort cases include (1) the place of injury, (2) the place of conduct, (3) the domicile of the parties, and (4) the place where the relationship, if any, between the parties is centered. *Restatement* § 145(2). The general factors to be considered in any choice of law analysis include: (1) the needs of the interstate and international system, (2) the policies of the forum, (3) the policies of other interested jurisdictions, (4) the protection of justified expectations, (5) the basic policies underlying the particular field of law, (6) certainty, predictability and uniformity of result, and (7) ease of applicability. *Restatement* § 6.

Value Partners' injury (the loss of its Brazil-based staff and clients, and the resulting decrease in the revenue of its Brazilian office) was sustained in Brazil; one might also say that the loss was suffered in Italy, where Value Partners is headquartered and where any loss of revenue would ultimately be felt by the company. Much of the conduct at issue took place in Brazil, including the solicitation of Value Partners employees by the three Brazilians as agents of Bain, the logistical arrangements involved in starting a new office, and the taking of Value Partners documents to the office of Bain–Brazil. These events at least counterbalance, and perhaps outweigh, the activities that took place in Boston, which included interviewing the three partners, communicating with them via telephone and fax, preparing financial projections, and engaging in internal dis-

cussions about the deal. The domicile of the parties (Massachusetts for Bain, Brazil and Italy for Value Partners) is an even draw, and the parties' relationship, to the extent they had one, was not centered in Massachusetts. Thus, these factors, taken together, point toward Brazil.[6]

Under the general principles provided by the *Restatement,* arguments can be made that both Massachusetts and Brazil have an interest in this case. However, even though Massachusetts may have an interest in regulating the behavior of Massachusetts corporations outside of Massachusetts, Brazil has a more direct interest in regulating the behavior of foreign companies within Brazil, particularly when Brazilian businesses and Brazilian workers are involved. The choice of Brazilian law in this case would also favor uniformity and predictability, as all foreign companies committing tortious acts within a given country should be held to the same standards.

■ As I see it, there is but one thin thread by which one might pull chapter 93A into this case under choice of law principles, and that is by distinguishing between the substantive law of unfair competition (supplied here by Brazil) and the question of damages. Where punitive damages are at issue, some courts have bifurcated the choice of law analysis, holding that one jurisdiction's law governs the substantive claims and another jurisdiction's law governs damages. In *Ashland Oil, Inc. v. Miller Oil Purchasing Co.,* 678 F.2d 1293 (5th Cir.1982), the Court of Appeals for the Fifth Circuit held that Louisiana had the strongest interest in resolution of a defendant's liability where the defendant was a domiciliary of Louisiana whose misconduct had centered in Louisiana. However, the court held that Mississippi had the strongest interest in the resolution of the damages:

> Although the preponderance of Young's misconduct occurred in Louisiana, he knowingly transported the [hazardous] substances into Mississippi. . . . The integrity of the business community within Mississippi's jurisdiction was violated by Young's wanton enterprise. The purpose of Mississippi's exemplary damages rule would be accomplished by applying the rule to Young.

678 F.2d at 1306. In *James v. Powell,* 19 N.Y.2d 249, 279 N.Y.S.2d 10, 225 N.E.2d 741 (N.Y.1967), the New York Court of Appeals held that Puerto Rican law governed fraudulent conveyance of property to frustrate collection of New York judgment, but that New York had the strongest interest in protection of its judgment creditors and, accordingly, New York law should govern as to whether the judgment debtor's conduct warranted punitive damages. *James,* 19 N.Y.2d at 257–58, 279 N.Y.S.2d 10, 225 N.E.2d at 745–46. *See also Schulhof v. Northeast Cellulose, Inc.,* 545 F.Supp. 1200 (D.Mass.1982) (undertaking separate choice of law analysis for liability and damages).

The double or treble damages available under chapter 93A are punitive in nature. *See Cambridge Plating Co., Inc. v. NAP-*

---

**6.** Value Partners contends that where "the primary purpose of the tort rule involved is to deter or punish misconduct, the place where the conduct occurred has peculiar significance." *Restatement* § 145, comment e. However, as the *Restatement* notes, "[t]his factor must not be overemphasized. . . . To some extent, every tort rule is designed both to deter other wrongdoers and to compensate

the injured person . . . [and in] the case of a given rule it will frequently be difficult to tell which of these objectives is the more important." *Restatement* § 145, comment c. In any case, a significant portion of the conduct at issue took place in Brazil, and thus even under such a test Massachusetts would not necessarily be favored.

*CO, Inc.*, 890 F.Supp. 55 (D.Mass.1995) (citations omitted). The Massachusetts legislature has arguably shown, through enactment of chapter 93A, a particular interest in "policing the behavior of businesses domiciled within Massachusetts." *First Sec. Bank, N.A. v. Northwest Airlines, Inc.*, 2001 WL 92175, at *4 (D.Mass. Jan.3, 2001). Bain, a prominent Boston company, certainly qualifies as such. Nevertheless, I am also conscious of the considerations expressed in *Computer Systems Engineering, Inc. v. Qantel Corp.*, 571 F.Supp. 1365 (D.Mass.1983), *aff'd*, 740 F.2d 59 (1st Cir.1984). In that case, the plaintiff contended that California had a specific interest in deterring fraud by its domiciliary corporations that outweighed any Massachusetts interest in disallowing punitive damages, and that punitive damages should thus be allowed under California law. Rejecting this argument, the court cautioned that there is a danger "[w]hen a court combines elements of the laws of different states [that] might upset the delicate balance achieved by legislative compromise." *Qantel*, 571 F.Supp. at 1370 (citation omitted). Although there may be cases that warrant such a patchwork approach, I do not believe this to be one of them.

Because choice of law principles favor the application of Brazilian law to this case, Value Partners may not bring a claim under chapter 93A.

### B. Primarily and Substantially

■ Even if it were concluded that Massachusetts law governs, the provisions of chapter 93A itself would bar an action under the facts of this case. As noted above, chapter 93A provides that

No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition occurred primarily and substantially within the commonwealth. For the purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.

M.G.L. ch. 93A, § 11. The decisions of the Supreme Judicial Court of Massachusetts and those of the Court of Appeals for the First Circuit cumulatively lead to the conclusion that the "actions and transactions" in this case did not occur primarily and substantially in Massachusetts.

"The choice of law test and the 'primarily and substantially' test, though similar in many respects, are not identical." *Roche v. Royal Bank of Canada*, 109 F.3d 820, 826 n. 7 (1st Cir.1997). In *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662 (1985), a New York investment banker sued a Massachusetts corporation alleging that deceptive statements were made to him in the course of phone calls between Massachusetts and New York. Rejecting the chapter 93A claim as not occurring primarily and substantially within Massachusetts, the SJC based its finding on the following three factors: (1) where the allegedly false statements were made (Massachusetts), (2) where they were received and acted upon (New York), (3) and where the plaintiff's losses were incurred (New York). *Bushkin*, 393 Mass. at 638, 473 N.E.2d at 672. *See also Makino, U.S.A., Inc. v. Metlife Capital Credit Corp.*, 25 Mass.App.Ct. 302, 311, 518 N.E.2d 519, 523 (1988) (describing its approach as "perhaps" a more functional one, but "not fundamentally different" from that engaged in by the court in *Bushkin*); *Clinton Hosp. Assn. v. Corson Group, Inc.*, 907 F.2d 1260, 1266 (1st Cir.1990) (describing functional approach hinted at by Massachusetts courts but noting that the SJC has not gone beyond the *Bushkin* factors

"when the question is readily determinable by a narrow review of the evidence").

The present case concerns a collaboration between Bain executives located in Boston and three individuals living and working in Brazil. The three partners nurtured their plan to secede from Value Partners and shopped it around to a number of consulting firms. Bain took them up on it, and conducted extensive dealings with the three via phone and fax, during a visit to Boston by the three, and during a visit to Brazil by a Bain representative. Value Partners argues that the preponderance of these actions took place in Massachusetts, including discussions about the merits of the Newco plan; interviews with the three partners; receipt, review, revision, and approval of drafts of the Newco plan and the Master Plan of Implementation; deciding that the three Brazilians should wait a month to inform Value Partners of the departure; planning the logistics of the move; discussing client projects and deals; drafting and executing the written contract with the three Brazilians; and negotiation of a new contract with Robert Blocker. Value Partners emphasizes that the three Brazilians were not interested in dealing with Bain's Milan-based partner, but rather wanted to deal directly with Boston.

Value Partners further contends that the remaining two factors—where the acts were received or acted upon, and where the injury or loss was sustained—are immaterial because the language of 93A speaks only of where the "actions and transactions" occurred. In the alternative, Value Partners argues that it was injured in Massachusetts because the three Brazilians committed their breaches of fiduciary duty here.

Bain, in turn, contends that Value Partners neither received nor acted on anything in Massachusetts, where it has never had any presence. Nor did Value Partners, headquartered in Italy, with a subsidiary in Brazil, suffer any losses here. As to the first factor, Bain contends that the conduct that occurred in Boston constituted normal job-seeking and job offers, and that any conduct that might possibly be called unfair occurred in Brazil. Bain further notes that the most important meeting of Bain's Policy Committee, in which it decided to proceed with the negotiations to hire the three Brazilians, took place in California.

As to Value Partners' argument that the place of conduct is the only relevant factor: this reading of the statutory language might be persuasive if this were a case of first impression, but such an argument cannot be sustained in light of the extensive case law on the question. *See, e.g. Bushkin,* 393 Mass. at 638, 473 N.E.2d at 672; *Makino,* 25 Mass.App.Ct. at 311, 518 N.E.2d at 523; *Clinton Hosp.,* 907 F.2d at 1266. If anything, in cases involving (as here) tort-like chapter 93A claims, the First Circuit has emphasized the location of the plaintiff rather than the defendant. In affirming a chapter 93A award to a Massachusetts hospital that received misleading information from a New York search firm, the First Circuit explained:

> The location of the dissembler at the time he makes a deceptive statement is not the linchpin of the deception for the purpose of consumer protection law.... Rather, the critical factor is the locus of the recipient of the deception at the time of the reliance.

> The victim's ingestion of a deceptive statement and the subsequent effects from reliance on it are what give the deceptive statement its venomous sting. The site of the victim's ingestion is therefore critical to a determination of whether the deceptive or unfair acts

were committed primarily and substantially in the Commonwealth.

*Clinton Hosp.,* 907 F.2d at 1266. In the case at hand, it was not Bain's discussions in Boston that injured Value Partners, but rather the carrying out of Bain's decisions in Brazil.

All three *Bushkin* factors guide this inquiry. Working backward through them, from the least to the most complex, I find as follows: The third factor (where the losses occurred) weighs heavily in favor of Italy and Brazil rather than Massachusetts. In this age of multinational corporations, with transactions having connections to many different locations, there may be situations where the place of injury or loss is difficult to determine. Here, however, the only question is whether it was Massachusetts, and it seems clear that it was not.

Similarly, Value Partners, which has no apparent presence in Massachusetts, neither received nor acted upon anything here.

As in all such cases, where the acts took place is to some degree a metaphysical question. If a decision is made in Boston and carried out in Brazil, where does it "occur"? In *Clinton Hospital,* the First Circuit noted that, although the acts in question were committed in New York, they did not expire at the border because "it was intended that their force and input influence the plaintiff's behavior in Massachusetts." 907 F.2d at 1265. Here, not only were Bain's actions in Boston intended to have their effect in Brazil, but a very substantial portion of the conduct itself occurred in Brazil. Although the three Brazilian partners arguably did not become agents of Bain until they signed the contract on October 16, 1997, many of their tortious acts took place after that date. These include recruiting members of the Value Partners staff, making secret logistical arrangements to establish a new office, taking of documents and computer files from the Value Partners office, and making use of such documents in their work for Bain. Although Bain officials were located in Massachusetts, it is not clear that their acts were confined to the site where the decisions were made. In a case analogous to this one, involving a chapter 93A claim against a corporation headquartered in Massachusetts that made decisions about business dealings between rival hotels in another state, the Court of Appeals for the Eleventh Circuit held that "although Sheraton's contemplation of the acts may have taken place in Massachusetts, the acts themselves took place outside the Commonwealth." *Camp Creek,* 139 F.3d at 1410.

Guided by the precedents cited above, I conclude that the actions and transactions that lie at the heart of this case did not occur primarily and substantially in Massachusetts.

Accordingly, summary judgment is granted on Count V of the complaint.

It is so ordered.